STATE of Missouri, Plaintiff/Respondent,

v.

Ward Wayne LEITNER, Defendant/Appellant.

No. 20595.

Missouri Court of Appeals, Southern District, Division One.

April 17, 1997.

Motion for Rehearing or Transfer Denied May 9, 1997.

Application to Transfer Denied June 17, 1997.

Roy W. Brown, Bruce B. Brown, Kearney, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Assistant Attorney General, Jefferson City, for respondent.

W. ROBERT COPE, Special Judge.

Appellant, Ward Wayne Leitner (Defendant) appeals from a jury verdict finding him guilty of two felony counts. He was convicted on September 13, 1995, of second degree murder, § 565.021.1,[1] and armed criminal action, § 571.015. He was sentenced to consecutive terms of life imprisonment and 100 years, respectively.

The procedural facts which are relevant to this appeal are as follows:

November 3, 1993, to March 30, 1994—Felony complaint filed, preliminary hearing conducted, Defendant waived formal arraignment and entered a plea of not guilty (specific dates are not relevant to this appeal).

April 26, 1994—Defendant filed a Motion for a Change of Venue from Howell County, Missouri.

June 9, 1994—Defendant's Motion for Change of Venue was sustained and the case transferred to Phelps County, Missouri.

June 23, 1994—The case was filed in the Circuit Court of Phelps County, Missouri.

March 9, 1995—The case was set for a five day jury trial starting on July 31, 1995.

July 3, 1995—Defendant filed a "Motion to Dismiss Cause of Action and Discharge Defendant". This motion was based upon Section 545.890 and Section 545.920 RSMo.

July 10, 1995—Court denies Defendant's Motion to Dismiss filed on July 3, 1995.

July 27, 1995—State filed a Motion for Continuance. In it's Motion the State alleged that the Prosecuting Attorney's office was shorthanded and requested a Special Prosecuting Attorney be appointed and that the Special Prosecuting Attorney requested by the State had prior commitments and was unavailable for trial as currently scheduled. Defendant objected to this Motion. The Court sustained the State's Motion and appointed a Special Prosecuting Attorney and reset the case for jury trial starting on September 12, 1995.

September 12, 1995—Jury trial began and Defendant filed an "Amended Motion to Dismiss Cause of Action and Discharge Defendant." This was denied.

The relevant facts as presented at trial viewed in the light most favorable to the verdict are as follows:

On the evening of November 2, 1993, Janet Hatch, the victim, Rebecca Hatch,[2] her seventeen year old daughter, and Defendant went to Wal–Mart in West Plains, Missouri, to buy a calculator because Defendant believed Janet was spending too much of her money. Once at Wal–Mart, Janet realized that she did not have her checkbook with her to make the purchase. Defendant became upset with Janet and told her, "if you're going to act like a child, I'm going to whip your ass like a child." Defendant, Janet and Rebecca stayed in Wal–Mart for another five to ten minutes before they returned to their

---

1. All statutory references are to RSMo 1986, unless otherwise indicated.

2. We refer to the victim and her daughter by their respective first names, Janet and Rebecca, for the sake of clarity. We mean no disrespect.

home at 1313 Cynthia in West Plains, Missouri.

Once they returned home, Defendant made Janet lie naked on the floor with a pillow underneath her. Defendant then went and got the cord from the vacuum cleaner and hit Janet with it, from her neck down to the back of her knees, including the areas of her back and buttocks. Defendant looped the cord and swung it in an overhand fashion. Defendant then told Janet to roll over onto her back and Defendant hit her with the cord on the front of her body, from her chest to her knees. Janet asked Defendant to stop, but he refused. When Janet raised her head up and again asked Defendant to stop, Defendant said, "if you pick your head up again, I'm going to stomp your face."

After beating Janet, front and back, with the vacuum cord, Defendant called his mother who lived a few blocks away, and told her he was coming over to feed his dog. Defendant told Rebecca not to feel sorry for Janet "because she's just playing a pity party" and he also told Rebecca not to help her mother. Defendant instructed Janet to take a shower and then get on the exercise bike in the front room of the home before he returned.

After Defendant left for his mother's house, Rebecca tried to help Janet bathe and Janet mentioned that she felt light-headed and dizzy. When Defendant returned to the home, Janet was still in the bathroom. Defendant asked why Janet was not on the exercise bike and Rebecca explained that she was still in the bathroom.

Defendant went into the bathroom, grabbed Janet by the hair, brought her into the front room and told her to get on the exercise bike. Janet was standing but she was bent over and she told Defendant that she couldn't get on the bike because she was feeling faint. Defendant said, "I don't care. I want you to get on the bike anyway." Janet kept saying that she felt faint, and was unable to get on the bike. Defendant hit her twice with his fist in her face. Janet fell against the wall three or four times after Defendant hit her. When Defendant had dragged Janet into the front room by her hair, her buttocks were bleeding; after Defendant punched her, there was blood on the

wall near the exercise bike. There were also blood spots on the pillow that Defendant had told Janet to put on the floor.

Defendant continued to hit Janet in the face and Janet kept hitting the wall. Rebecca did not intervene while Defendant beat her mother as she testified she was afraid of Defendant and, in addition, she was four months pregnant. Defendant also hit Janet with a metal cane that Janet used to aid in walking.

At another point during this same series of events, Defendant started to get "real mad" and started hitting Janet between her shoulder blades with a miniature baseball bat. When Janet fell, Defendant picked her up and started hitting her on her back and buttocks with the cane. When Janet fell again, Defendant picked her up and hit her on the chest and stomach with the cane. Defendant told Rebecca to wake Janet up and the two started shaking Janet. When Janet didn't awaken, Defendant dragged her into the front room and started CPR. The beatings lasted over two hours.

Defendant told Rebecca to phone his mother, who arrived at the residence shortly thereafter. Defendant's mother suggested that they had better call 911 since Janet looked dead. An ambulance soon arrived and Janet was taken to the emergency room at Ozarks Medical Center. Janet had a bruise on her face and a cut on her head. Janet's mid-section was purple, bleeding and completely covered with welts and lacerations.

At approximately 11:00 p.m. that evening, Officers Darrin Reed and Charles Brotherton of the West Plains Police Department responded to the Ozarks Medical Center. Officer Reed spoke with Rebecca, who indicated that her mother had gone out for the evening, had returned home in the condition she was in when she was transported to the emergency room, and had gone in the kitchen and fallen and hit her head.

Officer Brotherton also went to Defendant's residence at 1313 Cynthia where he found an exercise bike in the living room area, a miniature bat in the kitchen and an electric cord in the master bedroom. Officer

Brotherton also noticed lashing marks on the ceiling. He took swabbings and samples of various red stains in the residence and submitted these samples, as well as pillows and the electrical cord found in the home, to the crime lab. Testing indicated that the electrical cord had human protein on it which contained an enzyme present in Janet's blood. A state serologist also detected either human protein or human blood in swabs taken from a dish towel, a bath towel, purple shorts and a t-shirt, a blanket and carpet strands taken from 1313 Cynthia.

Meanwhile, Defendant and Rebecca went to Defendant's mother's house. Defendant told Rebecca to keep to the story that she had told police but later, Rebecca received a call from Officer Reed who left a message for her to come to the police department. Once there, Rebecca changed her statement and explained that Defendant and Janet had gotten into an argument over a check that had bounced, that they were on their way to Wal–Mart, and that Defendant had told Janet that she had an "ass-whipping coming when she got home." Once at home, Rebecca indicated Defendant took a vacuum sweeper cord and beat Janet with it. While Rebecca had initially told police that Janet had gone out that evening to see her (Rebecca's) father, and had returned injured, at trial Rebecca testified that Janet had not been visiting Rebecca's father, George Hatch, and that, in fact, the couple had been separated for several months. Rebecca told police that Defendant had told her to make the earlier false statement that she had given at the hospital; she had done so because she feared Defendant was nearby. At the police department, however, Rebecca said she felt more comfortable and safe.

At trial, Rebecca also explained that on October 30, 1993, three days before her mother's death, Defendant had hit her (Rebecca) on her back, buttocks and front with a looped over vacuum cleaner cord. On that same occasion, Defendant also hit Rebecca in the face with his hand and fist. Rebecca had bruises on her back, buttocks, front and face as a result and a clerk at the Ozarks Medical Center photographed Rebecca's bruises.

Dr. James Spindler performed the autopsy on Janet on November 3, 1993. Dr. Spindler determined that the cause of death was massive multiple blunt force trauma to the head and all over the body. He also determined that Janet had nine rib fractures and collapsed lungs.

The injuries to Janet's lower legs were caused by a cylindrical object and she was struck approximately ten times with this object. The injuries to the backs of Janet's thighs and buttocks were caused by a loop of wire. She had been struck over one hundred times on the back with the looped wire and over fifty times on the front part of her body with this looped wire. Dr. Spindler testified that the electrical cord recovered from the home could have caused these looped injuries. He also testified that Janet's cane was consistent with the instrument that caused Janet's leg injuries.

Janet had also suffered facial and head injuries. Dr. Spindler found extensive bruising to the left cheek, the upper and lower lips and nose, and found that one of Janet's teeth was knocked loose from its socket. These facial injuries could have been caused with a small bat or a fist. Janet also had a cut on the back of her head. Examination of the brain revealed approximately three ounces of blood inside the skull cavity and on the surface of Janet's brain. Such bleeding causes the brain to swell and creates pressure on the vital centers in the brain, thereby causing unconsciousness and death.

Dr. Spindler indicated that the massive and extensive bruising suffered by Janet caused her to lose approximately two quarts of blood from her blood system, and that a blood loss of this magnitude would have a significant effect on a person and could cause them to go into shock. Janet's broken ribs, which had caused her lungs to collapse, would have rendered breathing difficult and would have caused her to become short of breath, dizzy, shocky, pale, sweaty, cold and clammy. Further, this would be quite painful. Dr. Spindler testified that any of Janet's injuries—the bruising, the broken ribs, or the bleeding in her brain—constituted serious physical injury and any one alone could have caused her death. Dr. Spindler opined

that a fall in the tub could not have caused Janet's massive trauma.

In his first point, Defendant argues that the trial court erred in overruling his Motion to Discharge as the court failed to try his case before the expiration of three terms of court as required by §§ 545.890 and 545.920. In addition, Defendant also contends that the trial court erred in granting the State's Motion for a Continuance over Defendant's objection.

This Court first reviews § 478.205 which states:

> The circuit court of each county ... shall be considered as being in continual session, and it shall not be necessary for a term or special term of any such court to be convened or held for such court or the judges thereof to conduct the business of the court with respect to any case or matter before the court. To the extent that a term of a circuit court may be required or specified by any provision of law, terms of each circuit court of the state shall be considered as commencing on the second Mondays in February, May, August and November of each year; provided, however, that no court by reason of this section shall be required to hold court on the first day of any such term and provided further that each circuit court for convenience may provide by local court rule for a different number of terms per year and for terms to commence on different dates.

■ While both the Defendant and the State have cited the first portion of Rule 2.2, Missouri Local Rules of Court, Twenty–Fifth Judicial Circuit,[3] they have both overlooked the second portion of the Rule which reads as follows:

> The circuit court of each county of the circuit shall be in continual session as provided by Section 478.205, RSMo. To the extent that a term of circuit court may be required, the terms of court for circuit court Divisions I and II shall be considered as commencing on the first Monday of the months of January, May and September.

No court shall be required to hold court on the first day of any such term because of this rule. [Eff. July 1, 1985]

Local Rule 2.2. It is the opinion of this Court that this section of Local Rule 2.2 is controlling as to when there are terms of Court as § 478.205 authorizes circuits to set the terms of court by local rule and this portion of Local Rule 2.2 specifically references § 478.205. Therefore, the terms of court are the first Mondays of January, May and September.

Defendant cites §§ 545.890 and 545.920 to support his Motion for Dismissal and Discharge. Section 545.890, provides as follows:

> If any person indicted for any offense, and committed to prison, shall not be brought to trial before the end of the second term of the court having jurisdiction of the offense which shall be held after such indictment found, he shall be entitled to be discharged, so far as relates to the offense for which he was committed, unless the delay shall happen on the application of the prisoner, or shall be occasioned by the want of time to try the cause at such second term.

Section 545.920 modifies this general rule in courts having more than two regular terms of court, as follows:

> In all cities or counties in this state in which there shall be more than two regular terms of the court having jurisdiction of criminal cases, the defendant shall not be entitled to be discharged for the reasons and under the circumstances mentioned in section 545.890 until the end of the third term after the indictment was found....

■ Since it has been established that Phelps County has more than two regular terms of court, § 545.920 is controlling. Looking at the facts in the case before us, the case was transferred to Phelps County from Howell County on a change of venue filed by Defendant on April 26, 1994. When Defendant's case arrived in Phelps County on June 23, 1994, it was during the May term

---

**3.** The first portion of Rule 2.2 states that the terms of court applicable to Phelps county, Division II are: Two weeks beginning the 2nd Monday in March; two weeks beginning the 2nd Monday in May; two weeks beginning the 2nd Monday in September and one week beginning the 3rd Monday in November.

of court. We consider that this filing of the case in Phelps County would be analogous to the phrase "after the indictment was found" as used in § 545.920. This is based upon the premise that the delay caused by the Defendant's request for change of venue cannot be charged to the State. *State v. Farrar*, 206 Mo.App. 339, 227 S.W. 1078, 1079 (1921); *see also* § 545.890.

In addition, in *State v. Harper*, 473 S.W.2d 419, 422 (Mo. banc 1971) the Missouri Supreme Court started counting the terms after the case arrived in the new county on a change of venue.

█ In the case before us, the May 1994 term would not be included for the purpose of § 545.920. Both *Hulstine v. State*, 533 S.W.2d 228, 230 (Mo.App.1975) and *State v. Morton*, 444 S.W.2d 420, 423 (Mo.1969) stand for the proposition that the term at which the information is filed is excluded in computing when Defendant must be brought to trial. This same reasoning applies when the case arrives in the new county on Defendant's request for a change of venue.

█ This means that the first term to be calculated for the purposes of this statute would be the September 1994 term. There is nothing in the record to show that there was any action on the part of the Court, the Defendant or the State to have the case set for trial during this September 1994 term. The second term would be the January 1995 term and the record shows that during that term, on March 9, 1995, the case was set for a jury trial starting on July 31, 1995. This trial date would have been during the May 1994 term of court.

Therefore, when the Defendant filed his Motion to Dismiss Cause of Action and Discharge Defendant on July 3, 1995, his case was set for trial during the May term of court and was within the time permitted by § 545.920 and was properly overruled by the trial court. This is true even if the September 1994 term of court is used to calculate the terms under the statute.

In addition, the Missouri Supreme Court reviewed a similar case in *State v. Harper*, 473 S.W.2d 419 (Mo. banc 1971). In that case the information was filed in one county and then a change of venue was taken to a second county. The second county had terms of court in April, August and December of each year. The case arrived at the new county and the Supreme Court indicated that "[t]he record is silent as to any action in this case during the April, August and December terms of 1968." *Id.* at 422.

The Defendant in *Harper* appeared on June 26, 1969, (April 1969 term) and the case was set for trial on November 7, 1969, (August 1969 term). The Defendant filed a Motion for Discharge on November 1, 1969. The motion was overruled by the trial court and this was affirmed by the Missouri Supreme Court. The Missouri Supreme Court made a thorough review of the Missouri statutes and cases as well as cases in other states and concluded:

In order to effectuate the purpose of these statutes we see no reason to hold that the entire burden of getting cases to trial promptly is upon the state and we do not believe that such was the legislative intent. We think it is reasonable to say that the legislature intended to provide a means of insuring every defendant a 'speedy trial' if he wants such a trial. It was never intended, in our judgment, to place such an arbitrary duty on the state that a defendant who does not desire a prompt trial can sit idly by without objecting to the delay or requesting a trial and, at the appropriate time, successfully assert a motion for release claiming that his right to a speedy trial had been violated and that he should go 'scot free.' We accordingly hold that a defendant is not entitled to be released under the statutes in question ... simply because the required number of terms have elapsed. In addition to that he must show that he has demanded a trial and that such request was made without success for a reasonable length of time before his right to release has been asserted. Our ruling is based on the theory (as stated in many of the cases cited) that a defendant's failure to take affirmative action seeking a speedy trial constitutes a waiver of that right.

*Harper*, 473 S.W.2d at 424.

*Harper* has been followed by this Court in other cases. *See State v. Powers*, 612 S.W.2d

8, 11 (Mo.App.1980); *State v. Haslip*, 583 S.W.2d 225, 229 (Mo.App.1979).

There is nothing in the record in the present case to show that any action was taken by Defendant to request a trial during the May 1994 term or the September 1994 term. Then, on March 9, 1995, (January 1995 term) the case was set for trial on July 31, 1995, (May 1995 term) and was tried, after the granting of one continuance, during the September 1995 term. Based upon the record the Defendant was tried within three terms after the initial setting for trial. Therefore, for the reasons set forth above, the trial court did not err in denying all of Defendant's motions for discharge and this point is denied.

■ Defendant's second point contains several subpoints alleging error by the trial court on questions of evidence. First, Defendant argues that he should have been allowed to introduce evidence which would have tended to prove that someone other than Defendant was the perpetrator of the injuries inflicted upon the victim. While it is not entirely clear from Defendant's Points Relied On, it appears that Defendant alleges that the trial court committed reversible error when it excluded Defendant's Exhibit A (a letter purportedly signed by Janet Hatch on July 19, 1993, and directed "To Whom To [sic] May Concern") and Defendant's Exhibit D (a docket sheet and Petition for Order of Protection).

Defendant argues that these two exhibits should have been admitted and would show that George Hatch, the victim's estranged husband, may have been the perpetrator. We disagree.

Missouri courts have long followed the proposition set forth in *State v. Wise*, 879 S.W.2d 494 (Mo. banc 1994), *cert. denied* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995) where the Court stated:

A criminal defendant may not introduce evidence that another person has had an opportunity or motive to commit the crime charged without proof that the other person 'committed some act *directly* connecting him with the crime'.

*Id.* at 510 (emphasis added).

The Court in *Wise* explained that evidence of another person's opportunity or motive has a high tendency to confuse or misdirect attention from the issues of the case and therefore the evidence is admissible only when Defendant is able to tie the evidence to proof that the other person committed an act directly connected with the crime. *Id.* at 511; *see also State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991), *cert. denied* 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992).

A review of Defendant's Exhibits A and D show that Defendant has failed to make this direct connection. Exhibit A does nothing more than cast a mere suspicion upon George Hatch. There is nothing in Exhibit A which would meet the requirements of the above cited cases. Defendant's Exhibit D also fails in showing any direct connection between George Hatch and the crime for which Defendant was convicted.

A full review of the transcript also fails to show at any point how Defendant offered to show how these exhibits directly connected George Hatch to the death of Janet Hatch. Therefore, no error occurred when the trial court did not allow the admission of Defendant's Exhibit A or D. Point denied.

Defendant's next allegation of error involves the trial court's ruling which occurred during the testimony of one of Defendant's witnesses, Virginia Leitner, Defendant's mother. The following occurred:

Q. [defense counsel] A day or two before November 2nd, this incident, did you have an opportunity to see Janet and Rebecca?

A. Yes, I did.

Q. And where did you see them?

A. At 1313 Cynthia when I was down there.

Q. And what did you observe when you were there?

MR. PRIVETTE [prosecutor]: Your Honor, may we approach? (out of hearing of the jury)

MR. PRIVETTE: Your Honor, I believe he's laying the foundation to try and put in

some kind of allegation that there was an argument or a fight or something going on, and it's wholly irrelevant to the issue. It only goes to cast some doubt or suspicion on a third person without there being any other evidence.

MR. BROWN [defense counsel]: Well, it's exactly—she observed a bruise and she asked about where she got it. From both of them, I think. That's perfectly legitimate evidence.

MR. PRIVETTE: Not without a basis.

THE COURT: What is your evidence?

MR. BROWN: Well, it's going to be that she observed a bruise on Rebecca on her hand and her face. And there was a conversation about what happened, and Janet told her what happened. And I think that's perfectly legitimate.

MR. PRIVETTE: That's hearsay. It's an alibi that's not endorsed in discovery.

THE COURT: Who is she going to say said what?

MR. BROWN: She's going to say that Janet said she hit her in the face.

THE COURT: She's going to say that Janet hit Rebecca.

MR. BROWN: Hit Rebecca.

THE COURT: And how is that not hearsay?

MR. BROWN: Well, it is, but, Your Honor, it's an exception to hearsay under *res gestae* in this case.

THE COURT: No. Sustained.

While the Defendant claimed that the evidence was an exception to the hearsay rule under *res gestae* during the trial, there is nothing in his brief which argues this point. In his brief, Defendant suggests that the trial court erred because the evidence involved Janet's "state of mind".

■ This Court will not convict a trial court of error on an issue which was not put before it to decide. *State v. West,* 849 S.W.2d 671, 674 (Mo.App.1993). This Court has followed that principle in *State v. Zerante,* 825 S.W.2d 41, 43 (Mo.App.1992) and *State v. Davenport,* 839 S.W.2d 723, 728 (Mo. App.1992). While these cases both dealt with the admission of evidence over a Defen-

dant's objection, we see no difference. If a defendant objects at trial and states one basis for the objection then he will not be allowed to change that basis on appeal. The same would apply to the defendant wanting to have evidence admitted. He cannot claim at trial that certain evidence falls within one exception to the hearsay rule and then claim another exception on appeal.

Even plain error review of the trial court's ruling under Rule 30.20 does not allow Defendant to prevail.

As the Court indicated in *West,* 849 S.W.2d at 674:

Relief will be granted under the plain error rule only when the error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice inexorably results if left uncorrected. The burden of demonstrating that the action of the trial court resulted in manifest injustice is allocated to the defendant. (Citation omitted.)

■ This Court finds no relevancy in the evidence that the victim reportedly told the Defendant's mother at a totally different time and place that she, Janet, had put the bruises on Rebecca Hatch. At best this evidence might go to impeach the direct testimony of Rebecca at trial when she testified that the Defendant had inflicted the bruises on her. We know of no rule of evidence which allows hearsay evidence to be admitted simply because it is to impeach. Therefore, the trial court properly excluded the testimony. In addition, this did not substantially affect the rights of the accused to the level that manifest injustice or a miscarriage of justice inexorably resulted.

Defendant next complains that the trial court erred in refusing to grant him a new trial on the basis of newly discovered evidence. The evidence in question was a statement by the State's witness, Rebecca Hatch, to the Probation and Parole Officer that during the beating of Janet Hatch by the Defendant which resulted in Janet's death, the Defendant had sex with both Janet Hatch and Rebecca Hatch. This appeared in a presentence investigation (PSI) report prepared at the trial court's request prior to sentenc-

ing. Defendant urges that the new evidence was not revealed by Rebecca during police interviews, at the preliminary hearing, during depositions taken by defense counsel or at trial. It may be of some import to note that Rebecca Hatch was under oath on three of the four occasions mentioned above and that the comment in the PSI was made during an interview by the Probation and Parole Officer after trial.

The law on the question of when newly discovered evidence will result in a new trial is well settled in Missouri. The Missouri Supreme Court in *State v. Amrine*, 741 S.W.2d 665 (Mo. banc 1987), *cert. denied* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988) stated:

'To receive a new trial based on newly discovered evidence the following must be established: (1) the evidence has come to the knowledge of the defendant since the trial; (2) it was not owing to want of due diligence that it was not discovered sooner; (3) the evidence is so material that it would probably produce a different result on a new trial; and (4) it is not cumulative only or merely impeaching the credit of the witness.'

*Id.* at 674.

■ This has been followed in numerous cases including *State v. Flemming*, 855 S.W.2d 517, 519–20 (Mo.App.1993) and *State v. Westcott*, 857 S.W.2d 393, 398 (Mo.App. 1993). In addition, this Court's review of the trial court's ruling is limited to whether or not there was an abuse of discretion. *Flemming*, 855 S.W.2d at 519.

■ In the case before us the evidence the Defendant points to could only be considered as impeaching the testimony of Rebecca Hatch. In addition, it is hard to conceive how evidence that the Defendant stopped beating the victim long enough to have sex with her and the witness, Rebecca Hatch, would have probably produced a different result at a new trial.

The trial court did not abuse its discretion in refusing to grant a new trial on the basis of statements in the PSI.

In Defendant's third and final point he alleges that the trial court erred in allowing the State's witness, Rebecca Hatch, to testify that the Defendant had assaulted her three days before he beat the victim.

Defendant argues that this testimony introduced evidence of other uncharged crimes or misconduct of Defendant and that the evidence did not fall within one of the recognized exceptions to the rule which does not allow this type of evidence.

The well recognized rule of evidence dealing with other uncharged crimes committed by the accused has been stated by the Missouri Supreme Court:

The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes.

There are exceptions to the rule. Evidence of prior misconduct of the defendant, although not admissible to show propensity, is admissible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial.... The balancing of the effect and value of evidence rests within the sound discretion of the trial court.

Generally, evidence of other, uncharged misconduct has a legitimate tendency to prove the specific crime charged when it 'tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; [or] (5) the identity of the person charged with the commission of the crime on trial.' The five enumerated exceptions have sometimes been difficult to define and apply. Evidence of prior misconduct that does not fall within one of the five enumerated exceptions may nevertheless be admissible if the evidence is logically and legally relevant.

*State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993) (citations omitted).

■ The evidence about which Defendant complains consists of photos of Rebecca taken at the hospital showing bruises on various

parts of her body and Rebecca's testimony that Defendant had done this three days earlier by striking her with a vacuum cleaner cord and with his hands and fist. She indicated that it was the same vacuum cleaner cord that Defendant had used to beat the victim.

This Court has indicated in at least two cases that uncharged acts committed against third persons may be admissible in corroboration of the victim's fear of the accused. *State v. Ficke*, 892 S.W.2d 814, 817 (Mo.App. 1995); *Davenport*, 839 S.W.2d at 728.

In the present case Defendant attempted to impeach the State's witness, Rebecca Hatch, with a prior inconsistent statement that she made of the night Janet was beaten to death. That statement was given to law enforcement officers in Defendant's presence. The State would be allowed to show that the reason Rebecca made the first statement was due to fear of Defendant and this fear was a result of the incident three days earlier.

For all of the reasons stated, this point is denied.

Therefore, for the reasons stated in this opinion the judgment of conviction is affirmed.

GARRISON and PREWITT, JJ., concur.