**STATE of Missouri, Plaintiff–Respondent,**

v.

**Harry NEWSOM, Defendant–Appellant.**

No. SD 29461.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 23, 2009.

Nancy A. McKerrow, Columbia, MO, for Appellant.

Chris Koster, Atty. Gen., Terrence M. Messonnier, Jefferson City, MO, for Respondent.

NANCY STEFFEN RAHMEYER, Judge.

Harry Newsom ("Appellant") was convicted of second-degree murder and armed criminal action after a jury trial in the circuit court of Greene County, and sentenced as a prior and persistent offender to consecutive life sentences on each count. He now appeals alleging that the trial court plainly erred in overruling Appellant's objections to hearsay testimony. We affirm.

## I. FACTS

In the early morning hours of April 15, 2006, emergency responders responded to a 9–1–1 call from the home of Amanda Jones, where Clifton Clemons ("the victim") was living at the time with Jones and her two children. Paramedic supervisor Jamie Schoolcraft, who was first on the scene, observed that Jones's demeanor was "frantic" as she waved him down. Upon entering the home, Schoolcraft found the victim lying on the floor with a large amount of blood on his face and surrounding him on the carpet. Schoolcraft also observed a large and heavy stump lying a few inches from the victim's head, which he had to move in order to treat the victim. While treating the victim, Schoolcraft noted that a large amount of blood and blood foam was coming out of his mouth, which indicated bleeding in the airway, and that the victim's face was "very pliable," which indicated that many of the bones in his face had been broken—injuries consistent with a large, heavy object having been dropped on the victim's head. Schoolcraft also estimated that the victim had lain there for several minutes. A minute or two later an ambulance crew

with a paramedic and an emergency medical technician arrived to transport the victim out of the home. The victim later died at the emergency room, as a result of severe blunt-force trauma to the head.

Corporal Robert Schroeder of the Springfield Police Department was the first law enforcement officer to arrive at the scene. He observed that Jones was "very upset, crying, almost hysterical." Jones told him that she had left to go to the store and returned to find the victim lying on the floor, and that she knew who might be responsible for the assault, but Corporal Schroeder did not attempt to ascertain the identity of possible suspects. Several other officers were dispatched to the scene to document and collect evidence, including a blood pool on the floor, a towel, a scuff mark on the wall, blood splatter on the wall, and the 104–pound stump.

Corporal Greg Higdon, who was assigned as the lead investigator on the case, talked with Jones later that morning at police headquarters. He noted that she had blood on her face and hands, which in his opinion was the result of a transfer, as opposed to a splatter. Following the initial interview, Corporal Higdon, Jones, and another officer left headquarters and headed to the home of Craig Hunt, Appellant's brother, in order to identify a potential suspect. Two detectives were dispatched to Hunt's house, where from they followed Appellant and Robin Montoya to Montoya's apartment before making contact with Appellant.

At the request of the detectives, Appellant voluntarily rode with them to the police station, where Corporal Higdon advised him of his *Miranda*[1] rights and proceeded to interview him. Appellant initially denied any involvement in the victim's death, but upon being told that the victim had in fact died, admitted to the killing. At some point during the interview, Corporal Higdon informed Appellant that Jones had seen Hunt's car there upon her return to her apartment. Appellant claimed that he was the only one present during the killing and that he had struck the victim and stomped on him; he provided demonstrations and descriptions of what transpired in Jones's home that matched the crime scene. Corporal Higdon also noticed that one of Appellant's shoes had what appeared to be blood on it, and photographed the shoes before taking them into evidence. While Corporal Higdon was interviewing Appellant, the detectives questioned Montoya at her apartment, where she eventually provided them with towels Appellant had used after showering.

The next day, Appellant sent word to Corporal Higdon that he wished to speak with him again. In a second videotaped interview, Appellant claimed that Jones had left the doors to her apartment unlocked, and he stated that after he initially hit and stomped on the victim, Jones arrived and suggested that the two drop the stump on him, which Jones and he did together. He also acknowledged that he had parked his brother's car in the area, but claimed that no one could have seen it. Appellant again provided demonstrations and descriptions of what had transpired that were consistent with the crime scene. Appellant also mentioned that Jones had been trying to sell a car to a Mr. Black. Corporal Higdon testified that phone records showed calls from Jones's residence to Black's phone in the late evening, around 11:30 p.m. or so, on April 14, 2006; phone records also showed that a call was made on Black's phone to Jones's apartment around 1:16 a.m., on April 15, 2006.

1. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

A few days after the victim's death, Corporal Higdon conducted a second interview with Jones. She requested that Corporal Higdon listen to a phone call she made in the early-morning hours of April 15, 2006, which was on her answering machine. After the interview, Corporal Higdon and another detective went with Jones to her apartment, where Corporal Higdon recorded a message from her answering machine. The voice on the message was that of Jones, and the message had been received at approximately 1:16 a.m., on April 15, 2006.

A few months later, Montoya came forward with additional information regarding Appellant. At trial, she testified to the following: that she knew Appellant, Ron Owen, and Hunt because they smoked crack cocaine together; that Appellant and Owen had been at her apartment the evening of the murder; that Appellant left at some point during that evening; that Appellant returned with Hunt around 1:30 or 2:00 a.m. the morning of the murder; that the four used crack cocaine together; and that upon their return, she had overheard Appellant say to Hunt, "I think I might have killed that guy." Later that morning, Montoya, Appellant, and Owen drove a brown car and a red car to Hunt's home, left Owen and the brown car there, and returned to Montoya's apartment in the red car, where they were stopped by police. Montoya also claimed that prior to Appellant getting out of her car to talk with the police the morning of the murder, he said to her, "remember I was with you last night."

A felony information was filed on August 1, 2006, charging Appellant with second-degree murder and armed criminal action.[2] At trial, the State presented the testimony of the emergency responders, law enforcement officers, and Montoya. In addition, the State offered testimony from two of Jones's neighbors, who testified that they heard loud thumps that sounded like someone beating on something after midnight the morning of the killing. Both testified that they heard a series of noises, a pause, and a second series of thumps or bumps. One neighbor testified that she heard muffled conversation, and the other testified that she witnessed a car leaving quickly following the second series of noises.

Additionally, a DNA expert testified that the victim's blood was found on the stump and on Appellant's shoes, and that the secondary source of DNA on the stump did not match the profiles developed for Appellant, Hunt, Owen, Montoya, or Jones. A medical examiner testified that, after reviewing the victim's records, he had determined that the victim suffocated on his own blood after receiving a blunt force trauma to his face, which had caused facial bones to break and resulted in bleeding into his throat. The State also introduced and played for the jury redacted versions of the videotaped interviews of Appellant. Appellant presented testimony from law enforcement officers and Jamie Beard, an acquaintance of Hunt's girlfriend, whom she claimed had come to her home on April 15, 2006, and burned clothing and bloody shoes in a burn pile. Officers examined the burn pile twice but did not find any corroborating evidence.

Appellant makes two evidentiary challenges. First, in his point, Appellant alleges that the court errantly permitted the testimony of Corporal Higdon regarding Jones's statements. His point relied on specifically challenges the court's decision

---

**2.** The State's first amended felony information was filed in open court on January 11, 2008, which added the prior and persistent allegations and incorporated the other witnesses endorsed by a motion.

to, over Appellant's objection, allow Corporal Higdon to testify to Jones's out-of-court statements that she had called the house at 1:16 a.m. According to the transcript, however, Appellant did not object to that testimony. Even if Corporal Higdon's testimony was hearsay, the court committed no error in allowing it absent an objection from Appellant. *State v. Washington*, 260 S.W.3d 875, 881 (Mo.App. E.D.2008). Appellant appears to consider Corporal Higdon's testimony regarding the tape to be synonymous with the playing of the tape itself. While a recording of the message was not included in the record, according to the transcript, the recording apparently contained a message to the effect of "Hello, hello, are you there, pick up, pick up."

After Corporal Higdon's testimony, Appellant did object to the State's attempt to play a recording of the voice message left on Jones's answering machine by Jones at 1:16 a.m., which is what Appellant attacks as inadmissible hearsay for the first time in the argument portion of his brief. Claims of error that first appear in the argument portion of a brief and are not raised in the point relied on are not preserved for review by this Court. *Stevenson v. State*, 299 S.W.3d 762, 765, 2009 WL 4293025, *2 (Mo.App. S.D.2009). Nevertheless, we may exercise our discretion and consider Appellant's argument regarding the playing of the tape.[3] *Id.* Second, Appellant challenges Corporal Higdon's testimony that Jones told him she had seen Hunt's car there when she returned home as inadmissible hearsay. Appellant concedes that neither issue was alleged in Appellant's motion for new trial, and therefore not properly preserved for our review, so he asks that we review the trial

court's rulings for plain error pursuant to Rule 30.20.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

We may review issues not properly preserved for appeal for plain error only. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). In doing so, we first consider whether the claim facially establishes substantial grounds for believing that plain error occurred. *State v. Garrison*, 276 S.W.3d 372, 374 (Mo.App. S.D. 2009). "Plain error is evident, obvious, and clear error." *Id.* If we find facially substantial grounds to believe plain error has been committed, we next consider whether Appellant suffered a manifest injustice or miscarriage of justice as a result of the error. *Id.* In order for an error to result in a manifest injustice or miscarriage of justice, it must be outcome determinative. *State v. Stidum*, 276 S.W.3d 910, 914 (Mo.App. S.D.2009). Erroneously admitted evidence is outcome determinative if it so influenced the jury, that upon consideration of all admissible evidence in the entire record, there appears to be a reasonable probability that, but for the evidence admitted in error, the jury would have reached a different conclusion. *State v. Robinson*, 196 S.W.3d 567, 573 (Mo.App. S.D.2006).

Both of Appellant's claims of error are that hearsay was erroneously admitted at trial. Hearsay evidence is in-court testimony regarding an out-of court statement used to prove the truth of the matter asserted therein that derives its value from the veracity of the out-of-court statement. *St. Louis Univ. v. Geary*, —— S.W.3d ——, ——, 2009 WL 3833827, *6 (Mo. banc 2009). Hearsay testimony is

---

3. We also remind counsel to review the dictates of *Thummel v. King*, 570 S.W.2d 679, 690 (Mo. banc 1978), and Rule 84.04 when drafting briefs for this Court. All rule references are to Missouri Court Rules (2009), unless otherwise specified.

inadmissible unless it either fits into a recognized exception or it is offered for a non-hearsay purpose. *Id.* If the relevance of a statement rests on the fact that it was made, and not in the content of the statement, it is not hearsay. *State v. Tyra,* 153 S.W.3d 341, 346 (Mo.App. S.D.2005). When in-court testimony regarding an out-of-court statement is used to explain the conduct of the witness rather than as proof of the facts asserted in the statement, the testimony does not constitute hearsay. *State v. Nabors,* 267 S.W.3d 789, 794 (Mo. App. E.D.2008). When a party inquires into part of an act, occurrence, or transaction they have "opened the door" to testimony regarding that act, occurrence, or transaction, and the opposing party is entitled to inquire into other parts of it in order to rebut possible inferences that may be drawn from an incomplete version presented by the adversary or to prove the party's own version of events. *State v. Robinson,* 196 S.W.3d 567, 573 (Mo.App. S.D.2006).

## III. ANSWERING MACHINE RECORDING

■ Appellant argues that the playing of the answering machine message constituted inadmissible hearsay because the recording was offered to prove that Jones was not in the apartment at the time the victim was killed and it did not fall under a recognized exception. The State argues that the recording is not hearsay because it was offered merely to prove that the statement was made, and its value is not derived from the truth of Jones's statement. We agree.

According to the transcript, the content of the message was something to the effect of "Hello, hello, are you there, pick up, pick up." As the trial court noted, there is nothing substantive in the statement. Its relevance does not lie with its truth or the credibility of the declarant, but rather with the fact that the message was left. Appellant admitted to the trial court that the State had already established by Corporal Higdon's testimony that there was a voice message at 1:16 a.m. by a voice recognized as that of Jones. The jury could infer that Jones was not in her apartment when she left the message, but nothing in the content of the message proves or disproves whether she was there or not. As the trial court saliently noted, the relevancy may have been concerning the time of death, the fact that someone called, and the fact that the victim did not answer. Jones's out-of-court statement was therefore not offered to prove the truth of the matter asserted in the statement, but merely to prove that the statement was made. Because the recorded message was not introduced for the truth of the matter asserted, Appellant's hearsay claim does not present facially substantial grounds to lead us to believe that the court committed plain error in allowing the jury to hear it. Furthermore, as we noted, the tape was cumulative to the unobjected to testimony of Corporal Higdon that Jones had called the house at 1:16 a.m. Point one is denied.

## IV. CORPORAL HIGDON'S TESTIMONY

■ Appellant next complains that Corporal Higdon should not have been allowed to testify to what Jones had told him regarding Hunt's car being at the apartment on the morning of the murder. The trial court ruled that the door to such testimony had been opened by Appellant and allowed Corporal Higdon to testify that he had information from Jones that she had seen Hunt's car upon her return home from the store when he interviewed Appellant.

On cross-examination, Appellant inquired of Corporal Higdon as to interrogation techniques he employed in the inter-

view; Appellant questioned the factual support Corporal Higdon had for statements he made to Appellant during the interview, including the following exchange.

[Appellant's Counsel]: Okay. And there were some other things that you misled [Appellant] about, correct, during the course of the interview?

[Corporal Higdon]: Such as?

. . . .

[Appellant's Counsel]: You told [Appellant] the next door neighbor had described [Hunt's] car as being at the scene that night. That wasn't correct?

[Corporal Higdon]: That's true.

[Appellant's Counsel]: There was no neighbor that ever told you they saw [Hunt's] car?

[Corporal Higdon]: That's correct.

[Appellant's Counsel]: When you talked about neighbors describing someone that matched [Appellant's] description, that wasn't true?

[Corporal Higdon]: That's correct.

[Appellant's Counsel]: No neighbor ever gave you any information about anybody?

[Corporal Higdon]: That's correct.

Appellant argues that he did not "open the door" to Corporal Higdon's testimony of the factual statement that Jones had told him she saw Hunt's car at her apartment when she returned home the morning of the murder because his questions had nothing to do with whether *Jones* saw Hunt's car at her home, and that therefore the testimony was inadmissible hearsay. The State argues that Appellant had opened the door by implying that Corporal Higdon had no information about the car when he informed Appellant during the initial interview that Hunt's car had been seen at Jones's apartment. We agree.

When Appellant inquired about the factual support Corporal Higdon had for his statements in the interview, it raised the inference that he had none, and thus entitled the State to elicit testimony to rebut that inference. Furthermore, the testimony was sought in order to explain the conduct of the witness, and therefore was not hearsay. The State essentially asked Corporal Higdon whether he was acting on information he had gathered when he told Appellant Hunt's car had been seen there, and he responded that he was. That testimony not only rebuts the inference that he had no information, but also explains why he may have told Appellant that Hunt's car had been seen there. Because it explains Corporal Higdon's subsequent conduct, it does not constitute hearsay. Accordingly, we do not find facially substantial grounds to believe plain error has been committed. Point two is denied.

We find no plain error in the trial court's decision to allow the evidence and affirm the judgment.

SCOTT, C.J., and LYNCH, P.J., concur.