**STATE of Missouri, Respondent,**

v.

**Andrew M.T. SAPIEN, Appellant.**

**No. WD 69575.**

Missouri Court of Appeals, Western District.

Feb. 22, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 29, 2011.

William E. Shull, Jr., Liberty, MO, for Appellant.

Terrence M. Messonnier, Jefferson City, MO, for Respondent

Before Thomas H. Newton, P.J., James Edward Welsh, and Alok Ahuja, JJ.

JAMES EDWARD WELSH, Judge.

Andrew Sapien appeals his conviction for two counts of statutory sodomy in the first degree involving his sister and step-brother. Sapien makes three arguments: first, that the circuit court erroneously admitted testimony concerning an uncharged crime to explain a witness's delayed reporting of one of Sapien's offenses; second, that the circuit court erroneously admitted evidence concerning the disposition of a juvenile charge during the sentencing phase of Sapien's trial; and third, that the circuit court erroneously refused to dismiss the charges against him on the basis of prosecutorial vindictiveness. We affirm.

**Factual Background**

Sapien was found guilty of two counts of statutory sodomy in the first degree. Following a separate sentencing phase of trial, the jury recommended that Sapien be sentenced to thirty years on each count. Consistent with the jury's recommendation, the circuit court sentenced Sapien to concurrent terms of thirty years. Sapien appeals.

The incidents giving rise to Sapien's sodomy convictions occurred in November and December of 2004. Sapien was living with his father and step-mother; Sapien's biological sister ("M.J.S."), step-brother ("D.T."), and step-sister ("M.T.") also lived in the house. At the time, M.J.S. was 10 years old; D.T. was 11.

The first incident, which occurred in November 2004 after the Thanksgiving break, involved Sapien, M.J.S., and D.T. After watching pornography on the computer, Sapien asked M.J.S. and D.T. whether they could "do [Sapien] a favor." After initially refusing, M.J.S. and D.T. yielded and went with Sapien to his bedroom in the basement. Sapien closed the door, and told M.J.S. and D.T. that they were not going to be let out of the room until they

did what he asked. He told them to pull their pants down, and they complied. Sapien then directed M.J.S. and D.T. to engage in sexual acts with each other. He later sodomized M.J.S. while rubbing her vagina with his hand, and he attempted to sodomize D.T.

M.J.S. described a second incident, which occurred a couple of weeks after the first incident. After viewing pornography, Sapien again approached M.J.S. and D.T. and asked them whether they would do him a favor. Sapien took M.J.S. and D.T. to their parents' bedroom upstairs. Sapien then told D.T. to leave, and took M.J.S. to a downstairs bathroom, lubricated his penis, and sodomized her.

D.T. also described other incidents in which he was sodomized by Sapien. During these incidents, Sapien had D.T. get on his hands and knees while Sapien got on his knees behind D.T. D.T. testified that Sapien's penis was definitely inside D.T.'s "butt" on these other occasions. He testified that these incidents occurred once in M.T.'s bedroom, and otherwise in Sapien's bedroom. D.T. testified that M.J.S. was present during the other incidents, except on one occasion when she acted as a lookout and alerted Sapien and D.T. when Sapien's mother returned home.

Neither M.J.S. nor D.T. initially told anyone about the first incident. Following the second incident, M.J.S. told M.T., her older step-sister, what had happened; however, the girls did not inform either of their parents at that time. M.T. testified at trial that she had herself observed a further incident, which involved Sapien and D.T. in the bathroom in November–December 2004. M.T. witnessed Sapien standing behind D.T. while both had their pants down; D.T. was on his knees, bent over the toilet. M.T. testified that she did not immediately reveal this incident to anyone because Sapien had raped her previously, and she was scared of him.

In January 2005, M.J.S. was again approached by Sapien to "do a job." This time, she refused and, with M.T., told her parents about Sapien's behavior. Sapien fled the house quickly, not even bothering to put on shoes, despite the fact that it was cold and snowy.

M.J.S. and D.T. were interviewed by police and examined by doctors. The examinations, performed by Dr. Michael Moran, did not show any physical abnormalities, although Dr. Moran testified that sodomization trauma often heals over time.

Jill Hazell, a member of Synergy Services, a child advocacy center, interviewed M.J.S. and D.T. individually on February 10, 2005. These interviews were recorded and transcribed, and admitted in evidence during Sapien's trial.

Sapien was initially charged with two counts of child molestation in the first degree (one for the acts involving M.J.S. and one for the acts involving D.T.). The State subsequently filed a first amended information amending both charges from child molestation in the first degree to the greater offense of statutory sodomy in the first degree. Prior to doing so, the State had notified defense counsel of its intention to file the amended charges, indicating that it would forego filing them if Sapien would enter a plea of guilty to the lesser charges of child endangerment in the first degree and accept a proposed disposition. Sapien rejected the State's plea offer, and the State thereafter filed the enhanced charges.

Sapien filed a motion to dismiss the first amended information, arguing that the filing of the new, heightened charges constituted vindictive prosecution because it was done in response to his rejection of the plea proposal. The motion was denied.

Sapien filed a pretrial motion *in limine* to exclude any evidence of his juvenile record. The circuit court entered an order *in limine* that such evidence was not to be introduced during the guilt phase unless Sapien testified. After the jury's finding of guilt in the first phase of Sapien's trial, the State asked the circuit court to order Sapien's juvenile records unsealed. Sapien objected. The circuit court ordered that the petition and order of disposition regarding Sapien's rape of M.T. be released to both attorneys. During the penalty phase and over Sapien's objection, M.T. testified about the details of Sapien's rape of her in March 2004. The State also introduced the petition and order of disposition from the juvenile division concerning this offense, again over Sapien's objection.

## Analysis

█ In his first point, Sapien argues that the circuit court erred in allowing M.T.'s testimony regarding his prior rape of her. In his cross-examination of M.T., Sapien's counsel highlighted the fact that, after discovering Sapien and D.T. apparently engaged in a sexual act in her bathroom, M.T. "[d]idn't [immediately] tell anybody about it" or "bring it to anybody's attention" but, instead, simply "went downstairs, sat on the couch, and watched TV." (M.T. and M.J.S. together informed their parents of Sapien's sexual acts involving M.J.S. and D.T. several weeks later.) In response to this cross-examination, the prosecution argued that Sapien had opened the door concerning the reasons for M.T.'s delayed reporting of what she had witnessed. The circuit court agreed. Over Sapien's objection, the court permitted the State on redirect examination to elicit testimony from M.T. that the

reason she had not immediately reported Sapien's misconduct was because she was scared of him, because he had previously raped her.[1]

█ We need not decide whether the circuit court properly exercised its discretion in permitting testimony concerning Sapien's prior rape of M.T. Even if the court's evidentiary ruling were erroneous, it would not justify reversal because Sapien has failed to establish that he suffered sufficient prejudice to require a new trial. "On direct appeal we review the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Middleton,* 995 S.W.2d 443, 452 (Mo. banc 1999) (citation and internal quotation marks omitted).

> The test for prejudice is whether the improper admission was outcome-determinative. A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence. In determining prejudice, this court considers the amount of the erroneously admitted evidence and the extent to which the evidence was referenced during the trial. When the inadmissible evidence is substantial and there are several references to the inadmissible evidence, prejudice is found.

*State v. Chism,* 252 S.W.3d 178, 185 (Mo. App.2008) (citations and internal quotation marks omitted) (concluding that the erro-

---

1. In making his record on this subject, the prosecutor specifically mentioned the tone of defense counsel's cross-examination. While our record cannot replicate the tone of the cross-examination, we acknowledge that the circuit court had the benefit of experiencing it first hand, and it may well have played a part in the court's ruling.

neous admission of evidence of uncharged misconduct was not prejudicial and, therefore, did not mandate a new trial).

We first note that the evidence concerning the uncharged offense admitted during the guilt phase of Sapien's trial was exceedingly limited and was essentially limited to M.T.'s three-word response—"He raped me."—to a question by the prosecution as to the source of her fear of Sapien. While it is a very serious allegation, it is significant that this issue was not highlighted during the testimony and *no* details concerning this other incident were provided to the jury. During closing arguments, the State referenced this allegation solely to argue that the jury should credit M.T.'s testimony as to the incident she had witnessed.

■ We also note that the evidence against Sapien was strong. While there was no physical evidence of his offenses, the testimony of his two victims, and their out-of-court statements, corroborated each other's accounts. The essence of the victims' accounts remained unchanged and consistent across the years and multiple retellings: Sapien's viewing pornography on the computer and then asking them to "do him a favor"; Sapien's engaging in acts of anal intercourse with each child; D.T.'s watching the door while Sapien sodomized M.J.S. in Sapien's bedroom; Sapien's telling the children not to tell their parents or the authorities; the physical position in which Sapien put the children when sodomizing them; and his use of a particular lubricant. While the dissent points out certain specific inconsistencies in the children's testimony, "in cases dealing with very sensitive subjects, it is common for the testimony of a victim of tender

years to contain some variations, contradictions or lapses in memory." *State v. Kelley,* 945 S.W.2d 611, 615 (Mo.App.1997) (citation and internal quotation marks omitted). The children's testimony was also corroborated by M.T.'s testimony as to the incident that she witnessed involving D.T.

It is also significant that, after his parents had been told and the police were called, Sapien fled from the home. Indeed, Sapien was in such a hurry that he left without shoes or a jacket, despite the fact that it was a cold January day with snow on the ground. His flight is significant additional evidence supporting a finding of guilt. *See, e.g., State v. Moyers,* 266 S.W.3d 272, 284 (Mo.App.2008).

Despite the emotional nature of the mention of the rape of the witness, in these circumstances we cannot conclude that there is a reasonable probability that the jury would have reached a different conclusion but for the allegedly erroneously-admitted evidence. We, therefore, deny Sapien's first point.

■ In his second point, Sapien argues that the circuit court violated section 211.271.3, RSMo 2000, when it allowed his juvenile court records into evidence during the sentencing phase of his trial.[2] We disagree.

Resolution of this point requires the reconciliation of two statutes that are seemingly in conflict. On the one hand, section 211.271.3 states that records of juvenile courts are not lawful and proper evidence against the child and shall not be used in any proceedings other than Chapter 211 proceedings.[3] On the other hand, section

---

2. Sapien makes no argument that the juvenile records were otherwise irrelevant or inadmissible in the sentencing phase of his trial.

3. Section 211.271.3 provides that "all admissions, confessions, and statements by the child to the juvenile officer and juvenile court personnel and all evidence given in cases un-

211.321.2(2), RSMo Cum.Supp.2010, provides that the record of a disposition of a juvenile case is public information to the same extent as records in criminal proceedings, if the juvenile was found to be delinquent based upon behavior that would have been a felony offense for an adult.[4]

■ Section 211.271.3's seemingly absolute mandate must be read in conjunction with section 211.321.2(2). A general statute must yield to a later and more specific statute in the event that the two conflict. *See, e.g., Smith v. Mo. Local Gov't Emps. Ret. Sys.*, 235 S.W.3d 578, 581 (Mo.App. 2007); *Normandy Fire Prot. Dist. v. Vill. of Pasadena Park*, 927 S.W.2d 516, 518 (Mo.App.1996). As opposed to section 211.271.3, which speaks in general terms about records in all juvenile cases, section 211.321.2(2) specifically addresses records in juvenile delinquency proceedings in which the charged offense would constitute a felony, a far more limited category. Moreover, while section 211.271.3 was last amended in 1969, section 211.321.2(2) was added to the statute in 1995. *See* H.B. 174, 325 & 326, 1995 Mo. Laws 544, 558–59. To the extent of any conflict, then, section 211.321.2(2) supersedes and qualifies section 211.271.3.

Section 211.321.2(2) plainly applies in this case. Sapien's juvenile adjudication was conducted pursuant to section 211.031.1(3), the jurisdictional statute for violations of the law committed by children under the age of seventeen. The petition and order at issue concerned a charge that Sapien had raped M.T. in 2004, which would constitute a felony if committed by an adult. Pursuant to section 211.321.2(2), therefore, the juvenile adjudication was a public record to the same extent as the records in criminal proceedings.[5] We deny Sapien's second point.

■■ In his third point, Sapien argues that the State engaged in prosecutorial vindictiveness by filing the amended information charging him with two counts of first-degree statutory sodomy. A prosecution arising out of vindictiveness violates the defendant's due process rights under the Fourteenth Amendment. *Wasman v. United States*, 468 U.S. 559, 565–66, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984).

■ A defendant can show prosecutorial vindictiveness in two different ways. *State v. Potts*, 181 S.W.3d 228, 233 (Mo. App.2005). In certain circumstances, a defendant may rely upon a presumption of prosecutorial vindictiveness, which arises when the circumstances create a reasonable likelihood of vindictiveness. *Id.* If this presumption is triggered, the burden of production shifts to the State to provide an objective, on-the-record reason for filing the enhanced charge besides punishing a defendant for exercising constitutional

---

der this chapter, as well as all reports and records of the juvenile court, are not lawful or proper evidence against the child and shall not be used for any purpose whatsoever in any proceeding, civil or criminal, other than proceedings under this chapter."

4. Section 211.321.2(2) provides: "After a child has been adjudicated delinquent pursuant to subdivision (3) of subsection 1 of section 211.031, for an offense which would be a felony if committed by an adult, the records of the dispositional hearing and proceedings related thereto shall be open to the public to the same extent that records of criminal proceedings are open to the public."

5. We also note that M.T. had already testified to the underlying offense and adjudication described in the petition and order. Sapien does not challenge the admission of M.T.'s sentencing-phase testimony in this appeal. Given M.T.'s testimony, admission of the petition and order was merely cumulative. *See, e.g., State v. Bell*, 274 S.W.3d 592, 596 (Mo. App.2009).

rights. *Chrisman v. State*, 297 S.W.3d 145, 148 (Mo.App.2009).

■ Where the presumption is inapplicable, a defendant can prove vindictiveness by putting on evidence of actual vindictiveness. *Potts*, 181 S.W.3d at 233–34. The defendant must show that the prosecutor's actual purpose in bringing enhanced charges was to penalize the defendant for exercising a constitutional right. *Id.* at 234.

In arguing for a presumption of vindictiveness, Sapien argues against well-established case law, which has generally refused to apply the presumption in a pretrial setting. *Chrisman*, 297 S.W.3d at 149 (citing *Potts*, 181 S.W.3d at 235); *State v. Massey*, 763 S.W.2d 181, 183 (Mo. App.1988) (citing *United States v. Goodwin*, 457 U.S. 368, 381, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). This is not to say that the presumption can never be applied to pretrial situations, however. In *Potts*, the court recognized that the presumption of vindictiveness was not rigidly limited to the circumstance where enhanced charges are filed following appellate reversal of a conviction and remand for a new trial. 181 S.W.3d at 234. However, *Potts* merely held that the presumption applied where enhanced charges were filed after a mistrial had been declared based on prosecutorial questioning in *voir dire*. *Id.* at 236–37; *see also State v. Cayson*, 747 S.W.2d 155, 157–58 (Mo. App.1987) (applying presumption where enhanced charges filed after circuit court ordered new trial based on instructional error); *State v. Juarez*, 26 S.W.3d 346, 354 (Mo.App.2000) (suggesting that presumption may apply where enhanced charges filed after defendant permitted to withdraw guilty plea to lesser charges). Indeed, *Potts* itself recognizes that "Missouri courts have consistently refused to

apply the . . . presumption in the pretrial setting." 181 S.W.3d at 235.

■ As a general proposition, a presumption of prosecutorial vindictiveness does not apply where enhanced charges are filed against a defendant in connection with pretrial plea negotiations. In *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the defendant was originally indicted for uttering a forged instrument. *Id.* at 358, 98 S.Ct. 663. During subsequent plea negotiations, the prosecutor informed the defendant that, if the defendant did not plead guilty, he would re-indict with an additional, and more severe, charge. *Id.* at 358–59, 98 S.Ct. 663. The State did not contest either that the prosecutor possessed the evidence regarding the additional charge at the time of the original indictment or that the defendant's rejection of the plea agreement led to the additional charge. *Id.* at 359, 98 S.Ct. 663.

*Bordenkircher* recognized that the prospect of a trial on enhanced charges likely has the effect of reducing defendants' willingness to exercise their right to trial; the Court nevertheless held that such an effect must be tolerated if the plea bargaining system is to be accepted. *Id.* at 364, 98 S.Ct. 663. Due process is not violated so long as the enhanced charges are supported by probable cause, and the defendant is free to accept or reject the plea offer. *Id.* at 363–64, 98 S.Ct. 663. Because the prosecution is permitted to attempt to induce guilty pleas, *Bordenkircher* concluded that it is best that such efforts take place in the open with clear communication between opposing counsel. *Id.* at 364–65, 98 S.Ct. 663.

■ *Bordenkircher* was followed in *Goodwin*, 457 U.S. 368, 102 S.Ct. 2485. *Goodwin* observed that the distinction between a prosecutor dismissing charges from an original indictment as an induce-

ment for a plea of guilty, and a prosecutor adding charges after plea negotiations failed, was one without a constitutional difference. *Id.* at 378 n. 10, 102 S.Ct. 2485. Thus, prosecutors can induce guilty pleas either by charging heavily up front and offering to dismiss charges or amend them to lesser offenses or, instead, by charging lightly at the outset and warning of possible additional charges; in neither case does a presumption of vindictiveness arise. For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded. *Id.* at 378, 102 S.Ct. 2485. As long as the charges are supported by probable cause, a prosecutor can raise the prospect of enhanced or additional charges in order to induce a guilty plea, just as the prosecutor can bring such charges at the outset and offer to reduce or drop them.

The case at bar is indistinguishable in all relevant aspects from *Bordenkircher* and *Goodwin.* Here, Sapien was initially charged with two counts of child molestation, a Class B felony. In subsequent negotiations, the prosecutor offered to amend the information to charge two counts of child endangerment in the first degree, a Class C felony. The prosecutor also informed Sapien that, should he not accept the offer, the State would file an amended information, charging him with the unclassified felonies of statutory sodomy in the first degree.[6] Thus, the prosecutor initially charged Sapien with appropriate charges and then offered to either reduce the charges in the event of a guilty plea or assert more severe charges if plea negotiations failed. This is an amalgam of the tactics approved by the Supreme

Court in *Bordenkircher* and *Goodwin.* No presumption of vindictiveness arises.

Sapien contends that vindictiveness is established because the State possessed all of the necessary evidence for bringing the enhanced charges at the time of the original indictment and acknowledged that Sapien's refusal to plead guilty led to the enhanced charges. Under *Bordenkircher* and *Goodwin,* however, these facts are irrelevant (absent a presumption of vindictiveness which is inapplicable here). Indeed, the prosecution in *Bordenkircher* made a similar acknowledgment that its charging decisions had been motivated by the defendant's refusal to plead guilty. *See* 434 U.S. at 359, 98 S.Ct. 663. We deny Sapien's third point.

### Conclusion

We, therefore, affirm the circuit court's judgment convicting Sapien of two counts of statutory sodomy in the first degree.

JAMES EDWARD WELSH, Judge writes for the majority.

THOMAS H. NEWTON, Presiding Judge, concurs.

ALOK AHUJA, Judge, writes the dissent.

ALOK AHUJA, Judge.

I respectfully dissent. Andrew Sapien was convicted of sexually molesting two of his siblings while he and his victims were living in the same household. The trial court permitted the State to adduce evidence during the guilt phase of Sapien's trial of his rape of *another* sibling and household member, for which Sapien had been previously prosecuted through the juvenile justice system. I believe that the trial court erroneously admitted evidence

---

**6.** There is no dispute that the more severe charges of statutory sodomy were fully justi-

fied by the evidence and that the State had probable cause for asserting them.

of this uncharged rape, and that the erroneous admission of this substantially similar, serious, uncharged sex offense denied Sapien a fair trial. I would therefore reverse his convictions and remand for a new trial.[1]

## I.

The rule prohibiting the admission of evidence of uncharged crimes originates in provisions of the Missouri Constitution specifying that a criminal defendant shall only be tried for the crimes with which he is explicitly charged.

> The rationale underlying this rule is grounded in the view that "[e]vidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted." This right arises from the guarantee of article I, sections 17 and 18(a) of the Missouri Constitution that a defendant has the right to be tried only on the offense charged. Article I, section 17 provides that "no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information." Article I, section 18(a) states "[t]hat in criminal prosecutions the accused shall have the right ... to demand the nature and cause of the accusation...."

*State v. Vorhees*, 248 S.W.3d 585, 587–88 (Mo. banc 2008) (citations omitted). The rule barring other crimes evidence serves a critical function in the criminal justice system.

> This evidentiary bar stems from the need to avoid "encourag[ing] the jury to convict the defendant because of his propensity to commit such crimes without regard to whether he is actually guilty of the crime charged." In other words, the law shields defendants from the per-

ception that a person who has acted criminally once will do so again.

*State v. Ellison*, 239 S.W.3d 603, 606 (Mo. banc 2007) (citations omitted).

The Missouri Supreme Court has cautioned that, "[i]n all cases in which evidence of uncharged misconduct is offered, 'the dangerous tendency and misleading probative force of this class of evidence require that its admission should be subjected by the courts to rigid scrutiny.'" *State v. Burns*, 978 S.W.2d 759, 761 (Mo. banc 1998) (citations omitted); *see also State v. Nelson*, 178 S.W.3d 638, 642 (Mo. App. E.D.2005) ("Generally, 'trial courts should be wary of evidence of other crimes due to the highly prejudicial character of such evidence.'" (citation omitted)).

There are exceptions to the general rule that evidence of uncharged crimes is inadmissible, however. Relevant here, the "opened-door" doctrine provides that "[w]here the defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue the defendant injects.'" *State v. East*, 976 S.W.2d 507, 511 (Mo.App. W.D.1998) (quoting *State v. Lingar*, 726 S.W.2d 728, 734–35 (Mo. banc 1987)). Put another way, when one party seeks to create an adverse inference based upon an incomplete presentation of the surrounding facts, the other party can introduce the rest of those facts to rebut the inference. *State v. Newsom*, 299 S.W.3d 784, 789 (Mo.App. S.D.2009). This opened-door doctrine was applied in, *e.g., State v. Fassero*, 256 S.W.3d 109, 118 (Mo. banc 2008); *State v. Still*, 216 S.W.3d 261, 270 (Mo.App. S.D.2007); *State v. Uka*, 25 S.W.3d 624, 627 (Mo.App. E.D.2000); and *State v. Leitner*, 945 S.W.2d 565, 575 (Mo.App. S.D.1997).

---

**1.** I concur in the majority's disposition of Sapien's other claims.

The "opened-door" doctrine presumes, however, that it is *the defendant* who "opened the door" to a particular line of inquiry by first introducing evidence from which a negative inference could be drawn. This is illustrated by *State v. Revelle,* 957 S.W.2d 428 (Mo.App. S.D.1997) (en banc), a case in which a husband was accused of killing his wife. At trial, the State was permitted to introduce otherwise incompetent evidence indicating that the couple's relationship was strained. Seeking to defend this evidentiary ruling, the State noted that the defense had testified that his relationship with his deceased wife was in fact amicable. The Southern District rejected this argument, because the State— not the defendant—had first offered evidence concerning the status of the parties' marriage, and could not rely on its own injection of this issue into the case to support the admission of otherwise inadmissible—and highly prejudicial—evidence. *Revelle* held that the State's argument fails for the simple reason that the State not Defendant—first injected the issue of whether Defendant and Lisa's relationship was amicable. *Id.* at 432–33.

> [T]he State first injected the issue by offering evidence thereon in its case-in-chief.... Since the State first injected the good marriage issue into the case, Lisa's note did not qualify as rebuttal evidence, the statements remained inadmissible, and their admission only served to improperly bolster an inference negative to Defendant.

*Id.* at 433. Extending the opened-door analogy, *Revelle* holds that the State may not walk through a door which it—*not* the defendant—first opens.

Here, it was the State which first introduced evidence concerning M.T.'s initial inaction and delayed reporting after witnessing Sapien's molestation of D.T. Accordingly, the State cannot justify the admission of evidence concerning Sapien's earlier rape of M.T. on the ground that Sapien opened the door to such evidence. In the prosecution's direct examination of M.T., she described opening a bathroom door to find Sapien and D.T. with their pants down, with Sapien behind D.T. in what one could infer was the act of sodomizing D.T., or preparing to sodomize D.T. The State concluded its direct examination of M.T. with the following questions:

Q. Tell the ladies and gentlemen, what did you do when you saw that?

A. I kind of stood there in awe for just enough to kind of try and process everything and then I closed my bedroom, my bathroom door. I went back downstairs and sat on the couch and watched TV.

Q. What happened a couple of minutes after you sat back on the couch and started watching TV?

A. Andrew and Dustin had come downstairs.

Q. Did you tell anybody anything right away at that point in time?

A. No.

Q. Did you eventually tell someone?

A. Yes.

This concluded the State's direct examination. The entirety of Sapien's cross-examination of M.T. follows:

Q. [M.T.], let me understand this correctly. You, after you say that you saw this you went back downstairs and you sat on the couch and you watched TV?

A. Yes.

Q. Didn't tell anybody about it?

A. No.

Q. Didn't bring it to anybody's attention?

A. No.

Q. Can you tell me what the date was that this occurred?

A. I do not know the exact date.

Q. Can you even tell me what month it was in?

A. It was in between, it right between holidays. It was November or December.

Q. So sometime during a two-month period?

A. Yeah.

Q. Can you tell me if it was closer to the first of November or closer to Thanksgiving?

A. It, it was after Thanksgiving, só it wasn't in the beginning of November. It was probably first of December, in between the first and the middle of December.

Q. And you went downstairs, sat on the couch and watched TV?

A. Yes.

Immediately after the last question, the prosecution approached the bench to express its concern about a possible negative inference triggered by this cross-examination. The prosecutor proposed that he be allowed to introduce evidence of Sapien's prior rape of M.T., which would explain her initial reluctance to interfere with, or report upon, Sapien. Although it acknowledged that the issue was "a close call," the trial court overruled Sapien's objections.[2] On redirect M.T. testified that she did not immediately report what she had witnessed "[b]ecause I was scared of" Sapien; in response to further questions from the prosecution asking for the source of her

fear, M.T. testified that Sapien "raped me" sometime between 2001 and 2003.[3]

Sapien's cross-examination did not "open the door" to evidence of Sapien's rape of M.T. In his brief cross-examination, Sapien brought out the following facts concerning M.T.'s initial reaction to what she had witnessed: (1) that after witnessing Sapien and D.T. in the bathroom, she "went downstairs, sat on the couch and watched TV"; and (2) that she "[d]idn't [immediately] tell anybody about it" or "bring it to anybody's attention." Both of these facts had been brought out during the State's immediately preceding direct examination, however. Sapien's two questions concerning M.T.'s returning downstairs and watching television were virtually a verbatim quotation of her testimony on direct; and on direct, the State had expressly asked M.T. to confirm that she did not "tell anybody anything right away at that point in time."

In these circumstances, where Sapien's cross-examination carefully stayed within the bounds of the information elicited by the prosecution on direct examination, I cannot agree that Sapien "opened the door" to the admission of highly inflammatory, and otherwise plainly inadmissible, evidence of his rape of M.T. Notably, the trial court itself apparently recognized that Sapien's cross-examination had merely covered the same ground as the prosecution's direct: when Sapien's counsel argued that the rape evidence should not come in because the prosecution "asked that very same question," the court responded that "[y]ou asked it too, Mr. Shull." But Sapien was entitled to explore on cross-examination the ground covered

---

2. During the bench conference on this issue, the State suggested that M.T. could limit her redirect testimony to merely stating "[t]hat she was afraid of [Sapien] because of something that happened to her," without describing specifically what Sapien had done. Sapien's counsel also offered not to argue any

negative inference in closing. Neither alternative was further explored.

3. In the sentencing phase of Sapien's trial, M.T. testified that the rape occurred in March 2004.

by the prosecution on direct; by following in the prosecution's footsteps, Sapien did not open a door which was otherwise closed.

The only other reason for admitting the rape evidence offered by the trial court was its observation that Sapien's counsel "didn't object to [the prosecution's] question." Testimony concerning M.T.'s immediate reaction following her observations was plainly relevant and admissible, however. And the fact that she did not immediately intervene or report the incident was—if anything—helpful to the defense. I cannot conceive of any basis on which Sapien *could have* objected to the prosecution's questions; nor can I perceive any reason why Sapien *would have* done so.[4]

It may well be that the State elicited M.T.'s testimony concerning her inaction and delayed reporting in order to preemptively "remove the sting" from this issue before the defense could exploit it. However, in an analogous context this Court has held that, where a criminal defendant objects to particular evidence which the trial court has ruled *in limine* that it will admit, the defendant may not preemptively offer the evidence himself; by doing so, the defendant waives its objection. Instead, we have made clear that, "to properly preserve an objection to the admission of the evidence ..., the [defendant] was required to wait until the State actually sought to admit the evidence and then

object." *State v. Mickle,* 164 S.W.3d 33, 55 (Mo.App. W.D.2005) (en banc). In the same way, if the State intended to offer evidence of Sapien's rape of M.T. to rebut any negative inference Sapien sought to raise based on her delayed reporting, it was required to wait until Sapien in fact broached the issue; the State cannot preemptively "open the door" itself, and then seek to exploit an opening it has itself created.

Even if Sapien's cross-examination of M.T.—in its tone or inflection, or simply by revisiting ground covered during direct—somehow "opened the door" concerning her immediate reaction to what she had witnessed, this did not justify the admission of testimony of an uncharged *rape.* The overarching questions in deciding whether evidence of uncharged crimes should be admitted are (1) whether that evidence " 'is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which is on trial,' " and (2) whether that evidence " 'is legally relevant, in that its probative value outweighs its prejudicial effect.' " *State v. Johnson,* 161 S.W.3d 920, 924 (Mo.App. S.D.2005) (quoting *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993)). In assessing the legal relevance of other crimes evidence, "the trial court must carefully consider that 'the inevitable tendency of such evidence is to raise a legally spurious presumption of guilt in the

4. On approaching the bench following Sapien's cross-examination of M.T., the prosecution first expressed concern with "the way [Sapien's counsel] asked that last question." The State argues on appeal that this statement refers to the tone used by defense counsel in his final cross-examination question. The trial court did not express any concern with the tone or manner in which Sapien's counsel conducted his cross-examination, however. Instead, as discussed in the text, the trial court stated only two bases for its evidentiary ruling on the record: (1) that Sapien's coun-

sel had followed the prosecution by *also* asking M.T. about her immediate reaction to what she witnessed; and (2) that Sapien's counsel did not object to the prosecution's closing questions on direct examination. Given the explicitly stated grounds for the trial court's ruling, and the lack of any indication that the court relied on the tone of Sapien's cross-examination, the trial court's ruling cannot be affirmed on the assumption that it depended on circumstances not reflected in the record.

minds of the jurors.'" *State v. Nelson*, 178 S.W.3d 638, 644 (Mo.App. E.D.2005) (quoting *State v. Clover*, 924 S.W.2d 853, 856 (Mo. banc 1996)). " 'Evidence of other crimes is highly prejudicial and should be received only when there is strict necessity.'" *Johnson*, 161 S.W.3d at 928 (citation omitted).

This analysis of logical and legal relevance should apply with full force to other-crimes evidence admitted under the "opened door" doctrine.

> Opening the door is one thing. But what comes through the door is another. Everything cannot come through the door....
>
> ... The doctrine of curative admissibility is one dangerously prone to overuse. Permission to explore in rebuttal with testimony not admissible on direct, on the ground that the other party has opened the doors, rests upon the necessity of removing prejudice in the interest of fairness.
>
> The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.

*United States v. Winston*, 447 F.2d 1236, 1240 (D.C.Cir.1971) (footnote, citations, and internal quotation marks omitted).[5]

In this case, Sapien's cross-examination expanded on M.T.'s direct testimony only incrementally (if at all). The prosecution offered to limit its redirect examination to only the fact that M.T. was scared of Sapien due to "something that happened to her," and the defense offered not to argue M.T.'s delayed reporting in closing. Moreover, the extremely (and unfairly) prejudicial effect of M.T.'s testimony on redirect is due not only to the fact that it involves the heinous crime of rape, but also because it involves a rape which occurred in strikingly similar circumstances to the offenses for which Sapien was on trial: it was another nonconsensual sexual offense involving one of Sapien's siblings, who resided in the same household with Sapien and the two victims. The danger that the jury would impermissibly conclude that Sapien was guilty of the charged offenses based on the "legally spurious presumption" that he had a propensity to commit such crimes was extremely high; on the other hand, the prejudice to the State's case caused by Sapien's brief (and largely repetitious) cross-examination was limited, and could have been addressed in other fashions (including those suggested by the prosecution and defense during the bench conference). In these circumstances, permitting the

---

**5.** Cited and followed in, *e.g.*, *Goines v. United States*, 905 A.2d 795, 800–01 (D.C.2006); *State v. Vandeweaghe*, 177 N.J. 229, 827 A.2d 1028, 1033 (2003); *Clark v. State*, 332 Md. 77, 629 A.2d 1239, 1245–46 (1993); *State v. Graham*, 200 Conn. 9, 509 A.2d 493, 496 (1986); *State v. Benoit*, 126 N.H. 6, 490 A.2d 295, 306 (1985); *Bentley v. State*, 711 P.2d 544, 546 (Alaska App.1985); *see also, e.g.*, *People v. Miller*, 890 P.2d 84, 99 (Colo.1995). Citing *Winston*, a leading treatise explains:

> Since this application of the doctrine of curative admissibility is based on the notion that the jury might be misled if contradictory evidence was excluded, the doctrine should not justify admission of that evidence when it is likely to do more harm in this respect than good. Thus, admissibility of evidence offered on the basis that defendant has opened the door should be evaluated under [Federal] Rule [of Evidence] 403.

27 C.A. Wright & V.J. Gold, FEDERAL PRACTICE AND PROCEDURE § 6096, at 667 n. 37 (2007); *see also* 21 C.A. Wright & K.W. Graham, Jr., FEDERAL PRACTICE AND PROCEDURE § 5039.1, at 837–38 (2005) ("opening the door does not deprive the trial court of the power to exclude evidence coming through it by an exercise of the discretion conferred by Rule 403").

prosecution to elicit testimony that M.T. had been raped by Sapien constituted an abuse of discretion, even if Sapien "opened the door" in some fashion.

## II.

The prejudicial effect of the erroneously admitted evidence requires that we grant Sapien a new trial.

" 'If evidence of a prior crime is not admissible under any exceptions to the general rule prohibiting its admission, the admission is presumed to be prejudicial.' " *State v. Johnson,* 161 S.W.3d 920, 928 (Mo. App. S.D.2005) (quoting *State v. Brooks,* 810 S.W.2d 627, 634 (Mo.App. E.D.1991)); *see also State v. Nelson,* 178 S.W.3d 638, 643 (Mo.App. E.D.2005); *State v. Lancaster,* 954 S.W.2d 27, 29 (Mo.App. E.D.1997). Evidence of a prior rape is particularly likely to have such a prejudicial effect. *Johnson,* 161 S.W.3d at 926 (" 'Such proof, especially as to crimes such as sodomy, would ... be likely to have a decidedly prejudicial effect upon the jury.' " (quoting *State v. Atkinson,* 293 S.W.2d 941, 944 (Mo.1956))).

The presumption of prejudice is not overcome here. *State v. Barriner,* 34 S.W.3d 139 (Mo. banc 2000), identifies the following factors to consider in determining the prejudicial effect of the improper admission of evidence of uncharged misconduct: (1) "the similarity of the charged offenses to the improperly admitted evidence"; (2) "[t]he amount of evidence that was erroneously admitted and the extent to which the evidence was referred to during the trial"; (3) "[w]hether the erroneously admitted evidence was highlighted throughout the trial"; and (4) whether the prosecution's elicitation of the improper evidence was intentional or inadvertent. *Id.* at 150–51. Here, the uncharged offense was markedly similar to the offenses for which Sapien was being tried: not only

was it an additional nonconsensual sexual offense, but it was an offense committed against another sibling of Sapien's, living in the same household as his victims in the charged offenses. Indeed, in its rebuttal closing argument, the prosecution tied the crimes committed against all three of Sapien's siblings together in arguing that the jury should accept the veracity of their accounts:

You had two little children and their sister get up there and tell you in great detail as to what happened to them during that time frame, [D.T.] and [M.J.S.] in winter 2004 and [M.T.] in 2001 and 2002.

While only a limited amount of evidence came in concerning M.T.'s rape during the guilt phase of Sapien's trial, that incident was highlighted in the prosecution's closing arguments. In its initial closing argument, the prosecution argued that M.T.'s testimony, although brief, "was very powerful" because she "was literally reliving her life" by telling the jury, first, what she had witnessed, and second, why she hadn't immediately told because of her fear of Sapien, "[b]ecause the very same Defendant had raped her." At the outset of its rebuttal closing, the prosecution emphasized that, while Sapien's closing had attacked the veracity of M.J.S. and D.T., he had not attacked M.T.'s credibility:

Ladies and gentlemen, Mr. Shull just got up and called these two children, [M.J.S.] and [D.T.], liars. You saw them on the stand and I'll let you make that determination for yourself. I did not hear him say [M.T.] was a liar, ladies and gentlemen, because you heard what her answer was when the question was asked, why didn't you tell? I was scared. Why were you scared? Because of something that happened. Well, what happened? He raped my during the timeframe of 2001 and 2002.

I did not hear that statement being called a lie.[6]

Finally, the evidence of M.T.'s rape was deliberately elicited by the prosecution; this evidence did not come in inadvertently.[7]

The relative weakness of the State's evidence also tilts in favor of a finding of reversible error. While the State plainly made a submissible case as to both counts of first-degree statutory sodomy, there was no physical evidence of sexual assault. There were also material inconsistencies in the testimony of the fact witnesses. Without exhaustively cataloguing all of the discrepancies, I find the following particularly significant:

- M.J.S. and D.T. only shared recollections of a single incident (even though each described further incidents in which the other child was present). Their descriptions of that single, common incident varied significantly. Thus, M.J.S.'s forensic interview and trial testimony make clear that, in the incident both she and D.T. describe, Sapien only sodomized her. She explained in both accounts that Sapien had to go to work after the incident, and that when he was done with her, she, Sapien, and D.T. all exited Sapien's bedroom. By contrast, D.T. testified at trial, and related in his forensic interview, that Sapien sodomized *both* children during this incident.

  In her forensic interview M.J.S. described engaging in simulated sexual activity with D.T. at Sapien's request during this incident, before Sapien sodomized her. She omitted this significant detail in her trial testimony. In *his* forensic interview, D.T. indicated that he actually engaged in anal intercourse with M.J.S., while at trial D.T. testified that he didn't remember whether he *actually* had sex with M.J.S., or merely simulated it.

- D.T.'s testimony did not corroborate the other incident M.J.S. described. The second incident M.J.S. described at trial, and in her forensic interview, involved Sapien taking her and D.T. to his parents' bedroom, exposing and lubricating his penis, then dismissing D.T. before taking M.J.S. to a downstairs bedroom and sodomizing her. D.T. specifically testified at trial that he could not recall this (presumably memorable) incident, and did not describe it in his forensic interview.

- M.J.S.'s testimony did not corroborate the other incidents D.T. described. D.T. related, both at trial and in his pre-trial statement, that there was more than one incident in Sapien's bedroom in which both he and M.J.S. were sodomized. Yet M.J.S.'s interview account, and her trial testimony, both make very clear that she was sodomized by Sapien only twice before she told her parents, and that D.T. was only present during one of those two incidents. M.J.S. also did not describe the *other* incident which D.T.

---

6. Later in its rebuttal closing argument, the prosecution argued that M.J.S. and D.T. had delayed reporting "because they knew what happened to their sister, [M.T.], as well." Sapien's objection to this argument—that there was no evidence the two victims knew of M.T.'s rape—was sustained.

7. I recognize that the trial court expressly permitted the prosecution to conduct the challenged examination, and I do not mean to suggest that the prosecution engaged in misconduct. Nevertheless, *Barriner* the Supreme Court found that evidence was intentionally elicited where the prosecutor "argued vigorously to the trial court in response to motions in limine filed by appellant in advance of trial that the evidence was relevant, both logically and legally." 34 S.W.3d at 151.

described, even though D.T. claimed that M.J.S. had acted as a look-out during this event, and had alerted D.T. and Sapien that their mother had returned home unexpectedly.

- D.T. did not testify at trial or in his forensic interview to the incident in the bathroom described by M.T., in which he was purportedly Sapien's victim. Indeed, D.T.'s testimony as to where the abuse had occurred (once possibly in M.T.'s bedroom, and otherwise in Sapien's bedroom) would exclude the incident M.T. described.

- D.T.'s description differed significantly between his forensic interview and trial testimony. During his forensic interview, D.T. stated that the *first* incident in which Sapien sodomized him occurred in his sister M.T.'s bedroom, because Sapien was trying to "frame" M.T. M.J.S. was not present, but served as a lookout from the living room downstairs, and alerted the boys when their mother arrived home. At trial, however, this became the *final* incident, and its location moved from M.T.'s upstairs bedroom to Sapien's bedroom downstairs.

In these circumstances, I believe that the admission of M.T.'s testimony that she had been raped by Sapien necessitates reversal, based on my conclusion " 'that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence.' " *Barriner*, 34 S.W.3d at 150 (citation omitted).