**STATE of Missouri, Plaintiff–Respondent,**

v.

**Bradley L. BROWN, Jr., Defendant–Appellant.**

**No. SD 30787.**

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 18, 2011.

Alexa Irene Pearson, Columbia, MO, for appellant.

Chris Koster, Attorney General, and John M. Reeves, Assistant Attorney General, for respondent.

GARY W. LYNCH, Judge.

Bradley L. Brown, Jr. ("Defendant"), appeals the trial court's judgment convicting him of domestic assault in the first degree, see section 565.072, RSMo Cum. Supp.2007, and armed criminal action, see section 571.015, and sentencing him as a prior and persistent offender to consecutive sentences of twenty years' imprisonment and ten years' imprisonment, respectively.[1] Defendant challenges the trial court's admission of testimony identifying the specific controlled substances involved in his prior convictions for possession and distribution of controlled substances and testimony about his demeanor at the police station after his arrest. Finding Defendant suffered no prejudice as a result of such alleged errors, we affirm.

### Factual and Procedural Background

Defendant was charged with one count of domestic assault in the first degree, one count of armed criminal action, and one count of felony resisting arrest, see section 575.150, RSMo Cum.Supp.2005. Viewed in the light most favorable to the verdict, State v. Stanley, 124 S.W.3d 70, 72 (Mo. App.2004), the following evidence was adduced at Defendant's jury trial.

Victim and Defendant started dating in December 2007. In late January or early February 2008, they leased a house at 119 Black Street, in Chaffee. On March 7, 2008, Victim returned home from work and was upset to find Defendant drunk when he was supposed to have been looking for a job. She left and went out with a friend

to a bar. Victim spent the night at her friend's house and returned home the following morning. Defendant was there, and they went about their day as usual.

Early that evening, Defendant and Victim joined others at a mutual friend's house, where they planned to watch a UFC fight. At some point in the evening, the women went to the store to buy liquor and margarita mix while the men remained at the house. While they were gone, the conversation among the men turned to pocket knives. Defendant pulled out a knife to show the other men and told them to feel how sharp the blade was, saying that he had just had it sharpened. The knife was described as an "old-timer fishing knife" with a straight blade about four inches long and a brown handle. The women returned from the store and made some margaritas, and the men watched the fight. Defendant was on his telephone from time to time, and at one point, he asked Victim to take him to his cousin's house, but she refused and did not want to leave. They eventually left around 10:00 and returned home because Defendant wanted to grill steaks he had set out to thaw.

At home, Victim made a salad and set the table for Defendant while he went outside to grill. Victim was not hungry, and she went to bed. When Defendant came back inside with the steaks, he became "aggravated" that Victim did not stay up to eat with him, and he told Victim that she was rude and disrespectful. Defendant got his pillow, told Victim that he was sleeping on the couch, and slammed the door on his way out of the bedroom. Soon, Victim heard a crash and got up to discover that Defendant had broken a plate. An argument ensued and escalated

---

1. Unless otherwise indicated, statutory references are to RSMo 2000.

into a physical struggle. Victim wanted Defendant to leave, but when he refused, she went into the bedroom to get her purse so she could leave. Defendant came after her, and as she tried to hold the bedroom door closed, Defendant tried to kick it in. When Victim let go of the door to retrieve her purse, Defendant grabbed her and threw her out of the bedroom. Victim picked up a telephone and told Defendant she was calling the police; he grabbed the telephone and threw it into the kitchen. Victim tried to reach the front door, but Defendant caught her by her hair and threw her to the floor. As Victim fought and pleaded with him to stop, Defendant told Victim that he loved her, did not want her to leave, and the only way she "was going to leave him was in a body bag."

Defendant produced a knife and started stabbing Victim. As she spun around and struggled to escape, Defendant continued stabbing at her back, neck, shoulders, head, and chest. When he stabbed her in the neck, she felt blood "shoot out[,]" and she became "deathly sick." She closed her eyes and exhaled, and Defendant got up, locked the front door, and walked into the bathroom. When Victim heard running water, she ran out of the house to the home next door and began pounding on the front door yelling for the neighbor to call 911.

At the house next door, the neighbor peeked outside when she heard someone beating on her door and saw Victim standing on her front porch with blood all over her. She called for help and was still talking on the phone when she saw "some figure of some kind" pull Victim away. Victim had heard the front door from her house open, and when she saw Defendant approaching, she wrapped her arms around a porch column to prevent him from dragging her away. Defendant suc-

ceeded in pulling her off the porch and carried her across the yard, but he let her go and ran back into their house when he saw a patrol car coming down the street. Victim saw a patrol car pass by their home, and she moved toward the street to get the attention of the officer.

City of Chaffee police officer Jason Hammontree was responding to a domestic disturbance call in the area around 119 Black Street when he found Victim lying in the street with multiple stab wounds and covered in blood. She told him that her boyfriend, Defendant, had stabbed her. Defendant was known to Hammontree, and when additional officers arrived, Hammontree entered the house where Defendant and Victim lived to search for Defendant. Hammontree did not find Defendant inside the house, but he observed blood on a column on the front porch and door, and inside, he found two spots of blood on the living room carpet, a broken telephone, and blood on the back door and door handle. He further noted that the kitchen was in disarray, with broken plates, utensils, and food on the floor. When he returned to the scene outside, a by-stander pointed Hammontree in the direction of another officer who was in pursuit of Defendant.

Hammontree joined in the chase, which ended when they saw Defendant enter an apartment at 113 Wright. When the officers reached the door of the apartment and identified themselves as police officers, a woman identified as Defendant's mother opened the door. As the officers entered the apartment, they observed Defendant with blood on his hands and clothing, standing in the kitchen. Defendant was arrested and transported to jail. Two searches of the area in and around the house and along the route Defendant ran to reach his mother's apartment failed to

turn up the knife that was used in the assault.

Victim was transported by ambulance to the emergency room and subsequently underwent surgery to repair her wounds. It was determined that she had sustained eleven knife wounds. One such wound entered her chest and punctured her right lung, and one on her neck, which came close to cutting an artery or the airway, severed her thyroid gland and hit her esophagus. The trauma surgeon who treated Victim testified that this wound went almost all the way through her neck. Further, there were multiple wounds to her shoulder, neck, back, and head, and a deep laceration to her left thumb that penetrated to the bone and cut a sensory nerve.

Defendant was found guilty by the jury on all counts. Upon Defendant's "Motion For Judgment Of Acquittal Or, In The Alternative, For A New Trial," the trial court entered judgment notwithstanding the verdict on Count III, resisting arrest, finding that there was inadequate "proof that there was, in fact, knowledge on behalf of the Defendant, either direct evidence or circumstantial evidence to indicate he knew that [law enforcement was] trying to effectuate an arrest."[2] Defendant was sentenced as a prior and persistent offender by the trial court to serve consecutive terms of twenty years' imprisonment on the domestic assault conviction and ten years' imprisonment on the armed criminal action conviction. These sentences were set to run concurrent with a previously imposed sentence in Mississippi County on which Defendant had been paroled at the time he was charged in the instant case. Defendant timely appealed his convictions.

2. The State did not appeal this determination.

### Defendant's Evidence at Trial

Defendant testified at his trial. Before addressing the events surrounding this case, however, he admitted three prior felony convictions: one for selling a controlled substance; and two for possession of a controlled substance. Turning to this case, his defense, in a nutshell, was that Victim stabbed herself in a drug-induced frenzy after Defendant threatened to leave, and then she placed the blame on him. He presented his version of his relationship with Victim and the events of the night in question, as follows:

Defendant testified that Victim used various controlled substances within the week before the night she was injured, that drugs were part of their relationship "on a daily basis" and they smoked marijuana "probably every day" until he stopped smoking it in order to obtain a job. After he quit smoking marijuana, he continued to use methamphetamine. Victim had used methamphetamine every day since the previous Sunday and took three Percocets that Thursday night so she could "calm down, relax and get some sleep." During the day of the stabbing, he and Victim smoked a "half of a quarter" gram of methamphetamine, the last of their supply, and Victim smoked some marijuana around 2:30 p.m. and smoked approximately three bowls of marijuana after they arrived at their friends' house that evening.

After he and Victim returned home from their friends' house, Defendant lit the charcoal in the grill, came in the house, removed his shoes and pants and left them in the kitchen before he went outside to put steaks on the grill. Victim had made a salad, set a plate, and fixed him a glass of tea, but she did not want to eat, and she went to bed. Defendant was not angry

with her when he found her in bed, although he "thought it was real shitty of her[,]" and he was not happy because she had been gone the night before and then she went to bed when he had the steaks ready, so he told her he was getting a pillow and blanket to sleep on the couch and planned on leaving the next day. At that point, Victim "went irate, just went nuts, started screaming, hollering and cussing at [him] and throwing pillows at [him]." When he sat down to start eating, Victim came out screaming and talking about killing herself, and when Defendant picked up the phone intending to call Victim's parents, she took the phone away from him and threw a plate across the kitchen. Victim pulled the knife out of Defendant's pants pocket and ran back into the bedroom.

Defendant got up, and while he was pulling on his pants and trying to kick in the bedroom door, the door opened and Victim "had the knife drawed [sic] up to her[ ]" and threatened to stab herself if Defendant left her. When Defendant "asked her if her fucking stabber was broke[,]" she started stabbing herself, first in the shoulder, then in her neck and face. Defendant said he begged her to stop and struggled with her to get the knife, and when he "told her you fucking crazy bitch, DFS will come in here and take your kids for this stupid shit[,]" she told him, "I'll make it look like you did it then."

Defendant went to the bathroom to get towels, as he intended to take Victim to the hospital, but when he returned, she had run out of the house and was at the neighbor's house banging on the door. Defendant caught up with her and pulled her off the porch, but she fell down, and he picked her up and carried her back to their yard. Defendant testified that he was going to take her to the hospital, but when they got back into their yard and he heard

sirens nearby, he ran back into their house where he retrieved his mother's house key and a car key and ran out the back door and up the alley to his mother's home so that he would have a witness to his arrest because he did not "want the police to beat [his] ass[.]" When he got to his mother's apartment, he told his mother, "They got me[,]" meaning, "I'm on parole, they got me, you know, I'm going back to prison."

Defendant explained that he ran because he was on parole and Victim was blaming him. He testified that Victim's blood was on his clothing because the wound to her left hand bled profusely and the blood dripped all over his hands. Also, when he carried her from the neighbor's front porch, she grabbed his legs to keep him from running, and her blood was transferred to his clothing.

Defendant called a pharmacologist, Dr. James O'Donnell, who testified on direct examination that it is possible that someone who ingested methamphetamine daily from Sunday to Saturday, smoked at least a half of a quarter gram of methamphetamine on Saturday, smoked a marijuana joint in the afternoon plus a couple more bowls of marijuana in the evening, and consumed one or two glasses of margaritas containing tequila could stab themselves multiple times and not even realize it. On cross-examination, the pharmacologist testified that one experiencing a drug-induced psychosis would also experience delusions and hallucinations. However, he acknowledged that Victim's emergency room drug-screen test results say nothing about Victim's condition on the night of the assault, because "screening tests that test the urine cannot infer actual effects on the person." In relation to Victim's alleged use of methamphetamine, the State cross-examined Dr. O'Donnell about his awareness "that individuals don't usually or the sale of meth doesn't always go with 100

percent purity," to which he responded, "You can't trust drug dealers."

### Discussion

Defendant presents three claims of trial court error, each alleging that the trial court abused its discretion in overruling counsel's objections to the admission of what Defendant claims is irrelevant and prejudicial testimony.

### Standard of Review

We review the trial court's decision to admit evidence for an abuse of discretion. *State v. Hudson*, 230 S.W.3d 665, 668 (Mo.App.2007). "An abuse of discretion occurs 'when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.'" *State v. Hitchcock*, 329 S.W.3d 741, 749 (Mo.App.2011) (quoting *State v. Gonzales*, 153 S.W.3d 311, 312 (Mo. banc 2005)). In addition to error, we review a claim alleging that the trial court erroneously admitted challenged testimony for prejudice and will reverse only when we find that the trial court's error was so prejudicial that it deprived a defendant of a fair trial. *State v. Sapien*, 337 S.W.3d 72, 76 (Mo.App.2011).

### No Prejudice by Admission of Testimony of Defendant's Demeanor at the Police Station

Defendant's first point relates to the charge of felony resisting arrest, upon which the jury found Defendant guilty. The trial court subsequently set aside the jury's verdict on that charge, finding that the evidence presented at trial was inadequate to support the finding of guilt. Defendant was tried on an amended information charging him with the class D felony of resisting arrest, alleging that "the defendant knowing that a[sic] law enforcement officers were making an arrest of the defendant for domestic assault in the first degree, for the purpose of preventing the officer from effecting the arrest, stop or detention, the defendant resisted the arrest by fleeing from the officers into [113] Wright St., Chaffee, Missouri."

Before trial, a hearing was held on Defendant's motion in limine requesting, *inter alia*, that the trial court preclude "[t]estimony from Officer Hammontree that Defendant was uncooperative while being booked and called Officer Hammontree a 'bitch[.]'" In his motion, Defendant contended that such testimony was "evidence of collateral bad conduct[,]" highly prejudicial, and not probative. At the hearing on the motion, counsel further argued that such testimony was not relevant to proving the charge of resisting arrest. The State argued that the officer's testimony related to Defendant's conduct during booking at the police station "does go to the resisting arrest [charge] and being uncooperative." The trial court denied Defendant's request.

On direct examination at trial, Officer Hammontree testified that when he and another officer encountered Defendant at his mother's apartment, Defendant complied when he was instructed to lie on the floor, and he was handcuffed and escorted to Hammontree's patrol car. Further questioning ensued relevant to Defendant's conduct upon his arrest, which we set forth below:

BY [counsel for Defendant on cross-examination]:

Q Officer, just to reiterate, at the apartment [Defendant] didn't fight with you?

A No, ma'am, he did not.

Q He complied and got down on the ground; he didn't pull away from the handcuffs?

A No, ma'am, he did not.

Q   He was compliant?

A   At that point, yes, ma'am.

[Counsel for Defendant]: No further questions.

THE COURT: Any redirect?

[Prosecuting Attorney]: Briefly, Judge.

REDIRECT EXAMINATION BY [Prosecuting Attorney]:

Q   Officer Hammontree, when you went into the residence, the 113 Wright Street to apprehend [Defendant], did you guys have your weapons drawn at that point?

A   I didn't. Officer Houston did.

Q   And following [Defendant] complying and allowing you to put handcuffs on him, did he continue to be cooperative?

[Counsel for Defendant]: Objection, Judge. Just previous motion.

THE COURT: Overruled.

[Prosecuting Attorney]: You can answer.

THE WITNESS: Can you repeat?

BY [Prosecuting Attorney]:

Q   Sure. After [Defendant] complied and allowed you to put handcuffs on him there at 113 Wright Street, did he continue to be compliant?

A   Until we got to the station.

Q   And what happened at the station?

A   He got belligerent. He was attempting to demean me. I believe at one point he called me a bitch, and he was just pretty well uncooperative.

[Prosecuting Attorney]: That's all, Judge.

[Counsel for Defendant]: No questions.

Included in his claims of error in his post-trial motion, Defendant claimed that the challenged testimony was irrelevant "and has absolutely nothing to do with whether or not Defendant resisted arrest at the scene or whether or not Defendant in fact stabbed" Victim. After hearing arguments on Defendant's motion, the trial court made the following ruling:

THE COURT: All right. The Court, having considered the motion for judgment [of] acquittal or in the alternative for new trial, I've looked at this more than once, and it is the determination of the Court that the Court is going to overrule the motion. The Court finds that the evidence was properly admitted, the questions were properly asked, and that the jury weighed that as did the Court in making its determination of a finding of guilt. However, the Court is going to set aside the judgment and the verdict of guilty with regards to Count III resisting arrest by fleeing. The Court does not believe there's adequate proof that there was, in fact, knowledge on behalf of the Defendant, either direct evidence or circumstantial evidence to indicate he knew that they were trying to effectuate an arrest. The Court will therefore set that one aside.

In his first point, Defendant alleges the following:

The trial court abused its discretion in denying defense counsel's motion in limine, and in overruling defense counsel's objection at trial and allowing the prosecutor to elicit testimony from Officer Jason Hammontree that [Defendant] was uncooperative while being booked in at the jail, that he was belligerent, and that he attempted to demean the officer and called him a "bitch," because this violated his right to due process of law, a fair trial, and to be tried only for the offenses charged, in violation of the Fourteenth Amendment to the United States Constitution and Article I, Sections 10, 17, and 18(a) of the Missouri Constitution, in that this evidence had no probative value, it was irrelevant to

whether [Defendant] resisted arrest by fleeing when the arrest was complete before he was transported to the police station, and it was extremely prejudicial and suggested to the jury that they should convict [Defendant] because he was a belligerent and argumentative person with a bad character.

■ Defendant is correct, in that Officer Hammontree's testimony regarding Defendant's alleged uncooperative and belligerent behavior following his arrest was not logically relevant to any material fact in the case. "[E]vidence must be both logically relevant, in that it has some legitimate tendency to establish the guilt of the accused for the charges for which he is on trial, and also legally relevant, in that its probative value outweighs its prejudicial effect." *State v. Winfrey,* 337 S.W.3d 1, 11 (Mo. banc 2011). Contrary to the State's assertion, evidence of a defendant's behavior after an arrest has been made and the defendant is in custody is not logically relevant in proving a charge of resisting arrest. *See State v. Ondo,* 231 S.W.3d 314, 316 (Mo.App.2007); *State v. St. George,* 215 S.W.3d 341, 345–46 (Mo.App.2007); *State v. Shanks,* 809 S.W.2d 413, 418 (Mo. App.1991) (overruled on other grounds by *Joy v. Morrison,* 254 S.W.3d 885 (Mo. banc 2008)). Thus, the trial court erroneously admitted this testimony.

■ Accordingly, we are left to determine whether the admission of this testimony was so prejudicial that it deprived Defendant of a fair trial. *Sapien,* 337 S.W.3d at 76.

In the presence of trial court error, reversal is required if the error [more likely than not] prejudices the entire proceeding against the defendant. This kind of prejudice is outcome-determinative and expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when consid-

ered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence. This outcome-determinative prejudice is different from the prejudice a trial court considers when it weighs the probative value of a piece of evidence against its potential for prejudice. This latter prejudice is evidence specific. *State v. Roberts,* 948 S.W.2d 577, 592 (Mo. banc 1997).

■ "In determining prejudice, this court considers the amount of the erroneously admitted evidence and 'the extent to which the evidence was [referenced] during the trial.' " *State v. Chism,* 252 S.W.3d 178, 185 (Mo.App.2008) (quoting *State v. Blakey,* 203 S.W.3d 806, 815 (Mo. App.2006)). "Absent a showing of prejudice, a trial court's admission of immaterial and irrelevant evidence, even of other crimes, will not be reversed." *State v. Burton,* 320 S.W.3d 170, 176 (Mo.App. 2010).

Here, the trial court's erroneous admission of this testimony did not result in outcome-determinative prejudice. Defendant has not directed us to any evidence that the contested testimony was so prejudicial that it deprived Defendant of a fair trial. The challenged testimony was neither initially highlighted nor thereafter repeated. The State did not refer to it in its closing argument.

■ When considering the challenged testimony "with and balanced against all of the evidence properly admitted," *see Manwarren,* 139 S.W.3d at 273, the evidence of Defendant's guilt was overwhelming. " '[O]verwhelming evidence of guilt may lead an appellate court to find that a defendant was not prejudiced by trial court error.' " *State v. Moyers,* 266 S.W.3d 272,

282 (Mo.App.2008) (quoting *State v. Banks*, 215 S.W.3d 118, 121 (Mo. banc 2007)).

While Defendant testified that he was trying to help Victim and obtain medical attention for her wounds, he admittedly pulled her from the neighbor's porch when she sought aid and he ran away when help did arrive. Defendant was the only person with Victim when she was injured, and his explanation was inconsistent with Victim's injuries. The State established through expert testimony that a wound on Victim's left hand was consistent with defensive wounds. The trauma surgeon who treated Victim testified that he believed that the laceration to Victim's left hand and thumb could have been a result of "putting her hands up and somebody was coming at her with a knife and cut her thumb."

Defendant also asserted that Victim self-inflicted her injuries in a drug-induced frenzy with a motive to blame him However-er, the same trauma surgeon testified that when one stabs oneself, "you're not going to see multiple stab wounds[,] because it hurts; and if they don't get the job done the first time, they typically stop or they deal with injuries.... I've never in my experience seen anyone injure themselves in this way."

Furthermore, the expert testimony did not support Defendant's claim that Victim had experienced any sort of psychotic episode. The trauma surgeon testified that Victim did not appear delusional or to have suffered any hallucination, answered his questions appropriately, knew who she was, knew what had happened to her, and provided information related to her allergies to medicines and surgical history. When asked if he saw anything to indicate that Victim had suffered from any chemi-cally-induced frenzy at the time, the surgeon answered, "Not at all."

The jury deliberated for twenty-three minutes. During this time, it elected a foreman and found Defendant guilty on all counts.

Because the testimony of Defendant's conduct at the police station was not ini-tially emphasized or ever mentioned again during the trial, and because the evidence of Defendant's guilt was otherwise over-whelming, we cannot say that "there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *Roberts*, 948 S.W.2d at 592. Defendant's first point is denied.

### No Prejudice by Admission of Testimony of Specific Controlled Substances Involved in Prior Convictions

■ Defendants second and third points are interrelated, as both address similar testimony elicited by the State during Defendant's cross-examination relating to the identity of the specific controlled substances involved in Defendant's admit-ted prior convictions. Defendant argues that such evidence "had no logical rele-vance to any issue in his trial." Defendant preserved his claim on appeal under his second point. He requests plain error re-view on his claim under his third point.[3] We address both points together and find that assuming the admission of this testi-mony was erroneous, a determination we do not reach, Defendant suffered no out-come-determinative prejudice as a result of such assumed error.

---

**3.** Defendant preserved his claim of error in regard to cross-examination regarding his 1999 conviction for distribution of LSD. De-fendant failed, however, to include any allega-tion of error in his post-trial motion related to his prior convictions for possession of meth-amphetamine.

Defense counsel raised the issue of Defendant's prior convictions on Defendant's direct examination as follows:

Q [by counsel] And [Defendant], I think we all know what we're here for today. I guess just to start, you do have a prior record; is that right?

A I do.

Q And did that start in 1993?

A '94, 1994, I believe.

Q Okay. And what was that for?

A Sales of a controlled substance.

Q And then moving on, did you pick up other charges in 1997?

A I did.

Q And what were those for?

A Possession of controlled substance.

Q Was there anything else besides possession of controlled substance?

A No, ma'am.

Q Do you recall a misdemeanor child support case?

A Yes, misdemeanor child support case, a misdemeanor.

Q Did it just slip your mind as a misdemeanor?

A Yes.

Q And then you mentioned 1997, possession of a controlled substance; is that right?

A Right.

Q And then moving on to 1999, did you pick up another misdemeanor?

A I did. For Class A misdemeanor resisting arrest by flee of police.

Q Okay. And then in 2001, is that your final charge?

A Yes.

Q What was that for?

A Possession of controlled substance.

Upon further direct examination, Defendant testified that on March 8, 2008, he was on parole for the 2001 charge for possession of a controlled substance.

When asked if drugs were a part of his relationship with Victim, Defendant responded, "On a daily basis." He testified that he and Victim "smoked marijuana probably every day[,]" that they "ate Xanax and done methamphetamine[ ]" and other pills. Defendant further stated that he stopped smoking marijuana when he applied for a job, however, he continued to use methamphetamine. The basis for Defendant's defense was his contention that Victim stabbed herself during a drug-induced frenzy after he told her he was leaving. Defendant described Victim's use of methamphetamine throughout the week preceding the incident, from Sunday night until Saturday morning when they ran out, her use of marijuana on the afternoon of March 8, 2008, and her consumption of one to two margaritas, as well as "[p]robably three" bowls of marijuana that night.

On cross-examination, the prosecutor asked Defendant what substance he possessed when he was charged with possession of a controlled substance. Counsel objected, stating, "It's completely irrelevant to get into the facts of each of these convictions." The prosecutor argued that "drugs are a central part of the defense that they're raising as to the victim, and they're negating the Defendant's use of the drugs. I'm just pointing out that his prior convictions were drugs and the types of drugs that he used." The trial court responded, "I'll let you go that far but not any further than that." Upon further cross-examination, Defendant testified that the two convictions for possession of a controlled substance involved methamphetamine, and his conviction for the sale of a controlled substance involved LSD.

■■■ "The trial court has broad discretion respecting the relevance and admissibility of evidence." *State v. Norman*, 243 S.W.3d 466, 471 (Mo.App.2007). Evi-

dence must be logically and legally relevant to be admissible. *State v. Manwarren*, 139 S.W.3d 267, 273 (Mo.App.2004). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable; evidence is legally relevant if its probative value outweighs its prejudicial effect." *Id.* Here, Defendant claims that "specific evidence relating to his prior conviction had no logical relevance to any issue in his trial[.]"

■ Section 491.050 provides that prior criminal convictions may be proved to affect a witness's credibility. The statute also provides that a witness testifying to prior criminal convictions "must answer any question relevant to that inquiry." For impeachment purposes, the State may inquire into "the fact of the conviction, the *nature of the charge,* place and date of the occurrence, and sentence imposed." *State v. Hill,* 823 S.W.2d 98, 102 (Mo.App.1991) (emphasis added). However, the State may not "unduly emphasize a conviction, go into the details of the crime so as to aggravate it, or use the conviction to suggest guilt of the offense for which defendant is standing trial." *Id.* Here, the State claims that the prosecutor's inquiry into the specific controlled substance for which Defendant was convicted of selling or possessing was relevant to "the nature of the charge" resulting in the prior convictions. We need not reach that issue, however, because, given the totality of the evidence in this case, Defendant was not prejudiced by the admission of testimony identifying the specific controlled substances supporting his prior convictions because any resulting prejudice was not outcome-determinative. *See Roberts,* 948 S.W.2d at 592.

■ As previously noted, without a showing of prejudice, a trial court's admission of immaterial and irrelevant evidence will not be reversed. *Burton,* 320 S.W.3d at 176. In determining prejudice, we look at whether "the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *Roberts,* 948 S.W.2d at 592. As part of this analysis, we consider the amount of the erroneously admitted evidence and the extent to which the evidence was referenced during the trial. *Chism,* 252 S.W.3d at 185.

Defendant voluntarily testified to the jury that he had a prior conviction for selling a controlled substance and two prior convictions for possession of a controlled substance. He does not and could not dispute that these prior convictions could be utilized by the State to challenge his credibility. *See* section 491.050. In addition, he told the jury that drugs were part of his and Victim's relationship "on a daily basis." He further testified that he and Victim smoked marijuana "probably every day" until he stopped smoking it in order to try and obtain a job. He admitted, however, that even after he quit using marijuana, he continued to use methamphetamine. He told the jury that on the day of the stabbing, he and Victim smoked a "half of a quarter" gram of methamphetamine, the last of their supply.

We fail to see how the identification of the specific drugs involved in Defendant's prior convictions so influenced the jury that, when considered with and balanced against the properly admitted overwhelming evidence of Defendant's guilt, discussed *supra,* and particularly when considered in the light of Defendant's admitted pervasive involvement with drugs, both longstanding and concurrent with Victim's stabbing, there is any reasonable probability that the jury would have reached a different conclusion but for the specific drugs in those prior convictions. *See Roberts,* 948 S.W.2d at 592. This is

especially so, given that the jury only deliberated for twenty-three minutes before finding Defendant guilty.

The only prejudice argument advanced by Defendant is that the State's closing argument "drew further attention to these specific facts by arguing that [Defendant] 'was the one with the convictions for drugs, meth, meth and LSD[,]' and 'You can't trust a drug dealer.'" Defendant, however, lifts these statements out of context.

After the State elicited from Defendant the specific substances involved in Defendant's prior convictions, that testimony was not mentioned again until the State's rebuttal closing argument. To provide the context for that argument, we begin with the last part of defense counsel's closing argument, as follows:

And Dr. O'Donnell talked about that morphine as well. And you can use your common sense on this also. Morphine is a highly sedative drug. It's used to bring comfort and relax, basically put you down so you're not in any pain. If [the emergency room physician] didn't see [Victim] in a frenzy, folks, that would be why. She had morphine to calm her down. She was out of that frenzy and it was after a six-day bender. She was coming down off of that. You add the morphine. That's why she was calm at that point.

Folks, when you weigh all of the evidence, all of the physical evidence, you look at all the pictures and you've listened to the testimony, it comes down now to two things, whether you believe [Defendant] or whether you believe [Victim]. [Defendant] is the one that's been honest with you about his drug use. [Victim] is the one that's been trying to hide the ball.

[The prosecutor] said that none of this makes sense; that the story doesn't make sense, but folks, that's methamphetamine. Methamphetamine does not make sense. It's a crazy drug. It's a crazy drug that made [Victim] stab herself on the night of March 8, 2008. Thank you.

The State immediately began its rebuttal closing argument with the following:

Thank you, Judge. There's a couple points there that I found very interesting. Methamphetamine is a crazy drug and it makes you do crazy things. The Defendant admitted he took meth that morning as well. He admitted that. In fact, the Defendant admitted that he was the one with the convictions for drugs, meth, meth and LSD. And [Victim's] story, [Defendant's] story. Dr. O'Connell [sic] did say something very important. You can't trust a drug dealer.

No other mention of the specific substances involved in Defendant's prior convictions was made during the trial.

It is clear from this context that the prosecutor's rebuttal closing remarks were made in direct response to Defendant's argument to the jury that "it comes down now to two things, whether you believe [Defendant] or whether you believe [Victim]. [Defendant] is the one that's been honest with you about his drug use." The prosecutor responded to that argument by pointing out that Defendant was not credible because he is the one, as opposed to Victim, with the convictions for drugs. This is a classic and legitimate credibility argument as allowed by section 491.050. Defendant has failed to demonstrate how the prosecutor's abbreviated passing reference to the specific drugs involved in those convictions served in any way to degrade Defendant's credibility further than the damage inflicted upon it by Defendant's admitted convictions for selling and possessing controlled substances.

Defendant next claims that the prosecutor's last statement was "an improper at-

tempt to show [Defendant's] propensity for criminal drug-related activity, and to draw attention to his prior convictions" by telling "the jury that [Defendant] was 'a drug dealer,' and that they should convict him on this basis." We disagree.

In making the challenged statement, the prosecutor was simply continuing his credibility attack on Defendant's testimony. He was urging the jury to disbelieve Defendant's testimony because he had a prior conviction for selling drugs and, as stated by Defendant's own expert drug witness, "you can't trust a drug dealer," i.e., a person who sells drugs is not credible. This argument was a proper use of Defendant's prior conviction for selling a controlled substance to challenge his credibility, as allowed by section 491.050, and that credibility argument was not enhanced in any way by the prosecutor's previous fleeting mention of the specific substances involved in Defendant's prior convictions.

Under the facts in this case, we find no outcome-determinative prejudice occurred by the trial court's admission of testimony identifying the specific controlled substances supporting Defendant's prior convictions. Thus, we find no reversible error. Because the absence of any prejudice precludes a determination that Defendant suffered a manifest injustice or a miscarriage of justice, *State v. Williams*, 329 S.W.3d 700, 705 (Mo.App.2010), we likewise find no plain error. Defendant's second and third points are denied.

### Decision

The trial court's judgment is affirmed.

BURRELL, P.J., and RAHMEYER, J., concur.